ALBANY,<br>August, 1821.<br>UNDERWOOD<br>v.<br>STUYVESANT.

Judgment affirmed.

---

UNDERWOOD <em>against</em> P. G. STUYVESANT.

THIS was an action of trespass on the case, for obstructing " a certain street, or private way, called *Peter-street,*" &c. tried at the *New-York* sittings, in *December,* 1819, before Mr. Justice *Woodworth.*

*Petrus Stuyvesant,* the father of the defendant, being owner of a large tract of land in the *ninth* ward of the city of *New-York,* called *Petersfield,* in the year 1796, caused the whole to be surveyed, and a map thereof made, on which the tract is described as laid out and divided into streets, blocks, and building lots. None of the streets so laid down, were ever adopted or authorised by the corporation of the city, or any other public authority, as public streets or highways. Among other streets laid down on this map, was one contemplated to be sixty feet wide, from the *Bowery* to the *East River,* crossing *Judith-street,* which was intersected by *Peter-street,* and thence run southerly to *Stuyvesant-street.* On the 30th of *April,* 1796, *Petrus Stuyvesant* leased two house lots to *Edward Richards,* and his assigns, for forty-two years, described as numbers seven and eight, of the *Petersfield* farm, " bounded on the west by *Bowery-lane,* northerly by *Peter-street,*" &c. ; and which leases were assigned to the plaintiff. *Petrus Stuyvesant* died in 1805, having devised the whole of *Petersfield* to the defendant, who, afterwards, leased to the plaintiff lot num-

The defendant, being owner of a tract of land in the city of *New-York,* surveyed and laid out the same into streets and squares for building lots, and leased some of the lots according to the map of this survey, which lots were bounded on one side by a street, as described on the map, though not actually opened; but the plan of these streets was never accepted or approved by the corporation; and the *commissioners* appointed by the act of the legislature, of the 3d of *April,* 1807, among other parts of the city, laid out this tract in a different manner, and crossing the proposed streets in different directions, and which plan of the commissioners was by the act declared to be conclusive. The defendant, who had, after giving a lease, partially opened the street proposed by him, and mentioned in the lease, after the report of the commissioners, shut up the street by a fence: *Held,* that the lessee could not maintain an action against him, for obstructing his right of way through the proposed street; there being another reasonable and convenient way left open from the premises, to an old established public highway or street; especially, as, by an act of the legislature, no streets in the city of *New-York,* laid out by individuals, could be established as *public streets,* until they were approved and accepted by the corporation.

ber forty-nine, bounded northerly on *Peter-street*, &c. for the term of forty-two years, from the first of *November*, 1804, referring to the same map and survey; and on the first of *October*, 1806, the defendant executed a lease to *James Turner*, of lot number forty-eight, "on the south side of *Peter-street*," &c. for the term of twenty-one years, referring to the same map and survey, &c. and which lease was duly assigned to the plaintiff. In each of these leases was a covenant, by which the lessee, and his assigns, covenanted to level and pave the streets on which the lots were bounded, to the middle thereof, in front of the lot, as the corporation should direct. The lessee, *Richards*, erected a house on his lot, fronting on the *Bowery*, about the date of his lease ; *Peter-street* was not then opened at all ; but a few years after, it was opened from the *Bowery* as far eastward as the rear of *Richards'* lot; and was afterwards, progressively, until about 1804, opened as far as *Judith-street;* but the space between *Peter-street* and *Stuyvesant-street* lay chiefly in common. Pursuant to the act of the third of *April*, 1807, (sess. 30. ch. 115.) "relative to improvements touching the laying out of streets and roads in the city of *New York*," the *commissioners* thereby appointed, in 1811, laid out, among other parts of the city, the whole of the *Petersfield* tract, into streets and avenues, without any regard whatever to the plan of *Petrus Stuyvesant*, as designated in his said map. Among these streets and avenues, so laid out by the commissioners, is the *third avenue*, opened in 1815, commencing at the *Bowery*, south of *Peter-street*, and intersecting *Peter-street*, between the *Bowery* and *Judith-street*, and is one of the great public roads leading to *Haerlem*. The commissioners also laid out another street, called *Ninth-street*, leading from the *Bowery* to the third avenue, crossing *Peter-street*, and the lots demised and occupied by the plaintiff; and a very considerable portion of which lots will be taken into *Ninth-street*, whenever it shall be actually laid open. In *August*, 1815, the defendant erected a fence across *Peter-street*, in a line with the eastern extremity of the plaintiff's lots, and built a house on the third avenue, standing partly on *Peter-street*, by means of which all passing from the plaintiff's

lots easterly to the third avenue, over *Peter-street*, was prevented. The plaintiff, under the several demises of the four lots above mentioned, claimed a right of way over what is called *Peter-street*, eastwardly, as far as the river, or at least as far as the third avenue; and this action was brought for a continuance of the obstruction so caused by the defendant, from the 27th of *December*, 1815, to the 21st of *July*, 1816, the time laid in the declaration.

The judge charged the jury, that the plaintiff had a right of way, eastwardly, from the rear of his lots, over *Peter-street*, to the extent of that street, as it existed at the time the leases were made; that this right depended on the construction to be given to the leases by which the lots are bounded on *Peter-street*; that in his opinion there was an implied grant of a right of way to the lessee over that street, not only from the four lots to the *Bowery-lane*, but, also, eastwardly, as far as *Peter-street* had been opened, at the time the leases were respectively executed; and that the defendant had no right to erect the fence, as he had done, and prevent the plaintiff from passing eastwardly from his lots to the third avenue. The jury found a verdict for the plaintiff, for two hundred dollars damages.

A motion was made to set aside the verdict, and for a new trial.

*Slosson*, for the defendant. The ground is admitted to be the property of the defendant. 1. A right of way over the ground of another, may be acquired, either by *grant*, by *prescription*, or by implication or *necessity*. (*Cruise's Dig*. tit. 24. s. 6—11. 1 *Saund. Rep*. 323. *n*. 6. *Willes' Rep*. 287. 6 *Mod*. 6.) No prescription is pretended in this case. Has the plaintiff, then, a right of way by *grant?* The leases do not, in *words*, give any such right or interest in the land; and such a right or interest cannot pass, except by express words. That the lots demised were bounded eastwardly on *Peter-street*, cannot give such a right; for bounding on the property of another, *ex vi termini*, excludes that property. (*Jackson*, ex dem. *Yates*, v. *Hathaway*, 15 *Johns. Rep*. 447. *Clap* v. *M'Neil*, 4 *Mass. Rep*. 589.) The covenant to repair the street in front of the

lots, contemplated the contingency of its being accepted by the corporation, otherwise the covenant was to have no effect. A *street* means a public way, *communis strata via.* It will not be denied that this was a private way ; and it is mere description that the premises are bounded on land of the defendant which he uses as a private way.

Is there, then, a right of way, by necessary implication? Such a right is created by, and confined to, the necessity of the case ; and that necessity is, that the lessee must have a way from the property to a public road or highway. (3 *Com. Dig. Chemin.* D. 3. 4.) Where a party insists on a right of way by necessity, it is a good answer to say, that he has another way to his land. A person claiming a right of way, must show a *terminus a quo*, and a *terminus ad quem.* A right of way to *Peter-street*, would not give a right to set a foot on *Judith-street*, or easterly, over the property of the defendant. (*Yelv.* 163, 164. 3 *Com. Dig. Chemin.* D. 2. 1 *Mod.* 190.)

2. An action for the *continuance* of a nuisance cannot be supported, where the parties are the same, without showing a former action and recovery. (*Cro. James*, 231. *Yelv.* 142, 143. *Dyer*, 319. *b.* p. 17. 1 *Com. Dig.* 303. *Action on the Case*, A. b.)

3. The damages are excessive. There was no evidence of any damage or inconvenience sustained by the plaintiff. The way was never used by him, and the obstruction was only for a few months.

*T. A. Emmet.* The word " street," *ex vi termini,* means a public way ; and though the words of the declaration make it uncertain whether it was a public or private way, yet it is now made certain by the verdict. In a case tried before Lord *Kenyon,* in *London,* (11 *East,* 374, 375, note.) where a street was left open to the public for six years, it was held sufficient to make it a public way. Here, the street was open from 1804 to 1815. The plaintiff, then, or any other individual, who may be injured by the plaintiff's obstructing this street, is entitled to an action. There may be a right of way arising by *implication*, as well as from necessity. And the intent may, in this case, be implied from the lan-

guage of the lease, and the map annexed to it. The plaintiff claims the right of way as an *easement*, appurtenant to the premises demised, not as an interest in the land of the defendant.

If the plaintiff shows that he has been injured, and sustained damage by the act of the defendant, he is entitled to support this action, whether there has been a former recovery or not. In the first action, the damages are, most probably, nominal, and by bringing a second action for the continuance of the nuisance, the plaintiff merely waives the nominal damages for the first erection, and smart money for the continuance of it; but not the damages he has actually sustained by the continuance of the obstruction. If the plaintiff proves injury and damage, he cannot be deprived of his action.

*D. B. Ogden*, in reply, said, that it could not have been the understanding of the parties, that what was designated on the map as *Peter-street*, should certainly, and at all events, become a street or public way; for they both well knew that, by the act of 1799, no street could become a public way, until it was accepted and approved by the corporation. The case cited from *East* can have no application, unless it is also shown, that by statute no street can become public, unless accepted by the corporation of *London*.

It is said the plaintiff has a right of way. But *to* what place? *Judith-street* has never been opened. It is part of a large pasture field, and exists merely on the map. By the act of 1817, after the report of the commissioners was confirmed, there could be no other streets than what were laid out on their map. The words of the lease are merely descriptive; they contain no grant of a right of way. A right of way, by necessity, to the *Bowery road*, is admitted. Such a right of way was never denied to the plaintiff, nor has he been disturbed in the possession of it. But suppose that the plaintiff has a right of way along *Peter-street*, he cannot recover in this action. He must first bring an action for erecting the nuisance, and if he recovers, and establishes the fact of its being a nuisance, he may then have his action for its continuance. It is contrary to all principle

to bring an action, in the first instance, for a *continuance* of a nuisance.

PLATT, J. delivered the opinion of the Court. From the best consideration which I have been able to give to this case, I incline to the opinion, that the plaintiff has no right of action. The original survey and map show that *Petrus Stuyvesant* formed a plan for laying out streets over his land, in 1796; but we must intend that every person knew, that those streets could not be established, as *public streets* of the city, unless they were sanctioned by the corporation, or other public agents having such powers. The plan was considered as a proposition which the corporation would undoubtedly adopt and sanction, as *the city gradually extended.* There is no pretence of any fraud or deception on the part of the defendant or his father. It must have been well understood by the parties to those leases, that the ground marked for the proposed streets was to be given and appropriated for that purpose, *provided,* the streets were sanctioned and adopted by public authority. The implied contract, on the part of Mr. *Stuyvesant,* was substantially this: I engage to give the ground for the streets, according to the map, *upon condition* that the corporation shall ratify it.

By the map of the city, made by *Goerck* and *Mangin,* city surveyors, in *November,* 1803, the streets planned by Mr. *Stuyvesant,* are all laid down; but with an explanatory note, stating that none of those streets had been approved and opened by the corporation, and " they are, therefore, to be considered subject to such future arrangements as the corporation may deem best calculated to promote the health, introduce regularity, and conduce to the convenience of the city."

The parties mutually contracted with a reference to the *contingency,* whether the government would or would not sanction the streets proposed by the proprietor. Suppose, then, that the corporation had expressly *rejected* the plan of Mr. *Stuyvesant,* and had laid out streets over the same ground, on an entirely *different plan;* would the lessee have a right to insist on the fulfilment of the *conditional* agreement on the part of the lessor? I think not.

The expected contingency would, in that case, have failed, without any fault or delinquency on the part of Mr. *Stuyvesant.* The *casus fœderis* would not have occurred; and the parties would have been mutually absolved from their contract in relation to the streets. Perhaps, a court of equity would have cancelled or modified the lease, on the ground that the consideration and inducement had substantially failed. But, allowing the lease to stand, the parties would be left to make an equitable adjustment, *in lieu* of the contemplated streets; and, I think, all that could be required of the lessor would be, that he allow a reasonable ingress and egress to and from the demised premises to some convenient highway. The *grantor* would have been under no more legal obligation to keep open the contemplated streets, than the *grantee* would be, to *level* and *pave* the street. Both those covenants would be defeated, by the failure of the contingency.

Now, it appears, that by the act of the third of *April,* 1807, the corporation of *New-York* were superseded, in regard to their power over these streets, and three commissioners were substituted, with more plenary authority. By the fourth section of that act, the commissioners have " exclusive power" over the subject; and it is enacted, that " no square or plot of ground, made by the intersection of any streets to be laid out by the said commissioners, shall ever, after the streets around the same shall be opened, be or remain divided by any public or open lane, alley, street, or thoroughfare." By the map annexed to the case, it will be seen, that (in 1811) the commissioners, disregarding the plan contemplated by these parties, laid out and established avenues and streets over the lands of *Petersfield,* in a manner entirely different from, and inconsistent with, the streets originally proposed by Mr. *Stuyvesant.* No authority short of the legislature can now alter or defeat the plan established by the commissioners; and *permanence* is strongly inscribed on what they have done. Indeed, the plan of the commissioners is, in a measure, already executed over these grounds, by the opening of the third avenue.

It seems to me, therefore, that the defendant, in 1815, not only had a right to fence up *Peter-street,* as he did; but that

ALBANY,
August, 1821.

GARDNER
v.
MILLER.

it was his duty to conform to the new regulation imposed by the government. The streets must not only be opened according to the new plan of the commissioners, but the law is express, that no public street, lane, alley, or thoroughfare, shall be permitted to intersect the squares or plots formed by the intersection of the streets laid out by the commissioners. *Peter-street* does intersect several of the squares laid out by the commissioners. It is true, that the streets and avenues, so established by the commissioners, are not to be opened, until the corporation of *New-York* shall direct; but we know they are proceeding very rapidly in those improvements; and it seems to me, that it would be vexatious and unjust, to compel the defendant to keep open the streets as originally contemplated by his ancestor, since it is ascertained, that his plan is defeated, and cannot be carried into effect.

The defendant has left a reasonable and convenient outlet, or private way, from the leased premises to the *Bowery-road*, which, in my judgment, is all that can be lawfully required of him, under the circumstances of this case.

We are, therefore, of opinion, that a new trial ought to be granted, with costs to abide the event.

New trial granted.