The papers were voluminous. The facts, so far as they relate to the several questions of law discussed on the argument, are sufficiently stated in the opinion of the court.

By the Court,

Bronson, J.
On behalf of the persons interested in the three last appeals, it is objected that Furman street is not a new street within the meaning of the first section of the act of April 30th, 1833; and consequently that neither the common council nor the commissioners had any jurisdiction in relation to this proceeding.
The village of Brooklyn was incorporated on the 12th April, 1816 (Laws of N. Y. vol. 4, p. 90, a). By the 18th section of the act, the trustees and all persons acting under their authority, were empowered “ to enter into and upon any lands, tenements, hereditaments, which they shall [652] deem necessary to be surveyed, used or converted, for laying out, opening and forming any street or highway; ” and it was made the duty of the trustees “ to cause a survey of said village to be made, by some capable person or persons, together with a fair map thereof, exhibiting the streets, roads and alleys to be permanently laid out, and accompanied by such remarks as the nature of the subject may require and admit, which map, with the accompanying remarks, shall be signed by the president of the board of trustees, for the time being, and kept by the clerk of the corporation, sub *366 ject, however, to the inspection of any inhabitant of the village, who may have an interest therein, in order that no resident may plead ignorance of the permanent plan to be adopted for opening, laying out, leveling, and regulating the streets of the said village of Brooklyn.” In pursuance of this authority, a survey and map of the village were made under the direction of the trustees in the year 1818, by Jeremiah Lott and William M. Stewart, surveyors. The map after having been approved by the trustees, was signed by the president, and filed with the clerk of the corporation, on the 8th April, 1819. On this map Furman street was laid down, where it is now proposed to open the same. The first section of the act of April, 30, 1833, session 1833, p. 499, provides, that whenever a petition shall be presented to the president and trustees “ to lay out and open any new street, avenue or square within the said village, or to widen or extend any old street within the same,” they may determine to make such improvement. The 10th section is in the following words; “in laying out avenues, streets, roads and highways, in pursuance of the preceding sections, the president and trustees shall have regard to the streets and highways already laid out in the other parts of the said village by law, or designated upon the village map, heretofore made in pursuance of an act of the legislature of the state so as to make the same conform thereto as far as may be practicable and consistent with the public convenience, to the end that uniformity may be produced, and the permanent interests of the said village consulted, in laying out the [653] streets and avenues thereof.” I think there is no reasonable ground for doubt, that by new streets, in the act of 1833, the legislature intended to provide for such streets as had not already been laid out and opened for public use; and that the authority of the common council under" this statute extends to the streets designated on the map of 1819, as well as to others which they may deem it expedient to lay out and open. The act of 1816, was prospective in its character. It did not provide for the present wants of the inhabitants by directing streets to be immediately opened; but had regard to the probable advance of the town in population and business, and the public avenues which might be required at. a future period. A suryey was directed of the streets “ to be permanently laid out; ” and the map was to be kept by the clerk of the corporation, subject to public inspection, “ in order that no resident may plead ignorance of the permanent plan to be adopted for opening, laying out, leveling and regulating the streets of the said village.” The survey and map were not for all purposes á present opening or laying out of new avenues; but a plan for executing such works in future; and the map was to be kept for inspection, to the end that all residents might know what was anticipated, and govern themselves accordingly. The act of 1833, adopted new regulations for laying out and opening the streets of the village, and there is no reason why its operation should be restricted so as to exclude the street marked on the map of 1818, unless the language of the statute obviously requires such a construction. I think it does not. The mere designation of the site of a street, was not, in any sense, opening it; nor was it for all purposes laying it out; and when the legislature provided for laying out and opening new streets, they no doubt intended to include all such avenues as were not then public.
It is objected on behalf of the person interested in the third appeal, that the common council had no jurisdiction, because their order for opening the street was made without the consent of the owners of the land. The validity of this objection may depend on the consideration whether the former provision in relation to the consent of the owners was repealed by the act of 1833. By the 5th section of the act of April 9th, 1824 (L. of 1824, p. 225), the consent of the owner was necessary on laying out any new street (President of Brooklyn v. Patchen, 8 Wendell, 58, 9). The 18th section of the act *367 of April 3, 1827 (L. of 1827, p. 135), probably requires the same construction. The act of 1833, amends the act of 1827, and repeals “ all such parts of it as are inconsistent with the provisions of this act.” § 24. The first section of the act of 1833, provides, that whenever any petition shall be presented to the president and trustees of the village, to lay out and open any new street, they may, under certain circumstances, determine by resolution, to make s' ch improvement. The consent of the owners of the land is not mentioned. Although affirmative words in a statute will not in all cases operate as a repeal of a former provision, I think the repealing clause in this statute was intended to reach the restriction in the act of 1827, which required the consent of the owner. Under the act of 1827, the trustees might lay out new streets, if the owner of the land “ will consent to the same.” By the act of 1833, they may lay out new streets without any such restriction. If the power conferred on the trustees by this statute is as extensive as it purports to be, it is inconsistent with the consent clause in the act of 1827, which consequently falls within the operation of the repealing clause in the new statute. But let it be supposed that this clause of the act of 1827, was not in terms repealed. It contained no other than affirmative words. It was not enacted that the trustees should not lay out streets without the consent of .the owner. But a power was given to lay out streets if the owner would consent. Then came the act of 1833, giving a similar power, without any restriction. There is nothing in the act from which it can be reasonably inferred that the legislature intended to restrict the operation of this new power beyond the qualifications with which it was granted, and which are enumerated in the section. There must be a petition, and public notice—there must be a remonstrance signed by a majority of the persons who will be assessed. If any other qualification was intended, why was it not inserted? Again, these qualifications were con- [655] tained, with the consent clause, in the act of 1827. Why were they repeated in the act of 1833, and the consent clause omitted1, if it was intended that this restriction should still continue to operate?
These are statutes in pari materi and for some purpose they must, no doubt, be construed together. But I can not believe that a new power conferred upon trustees to lay out and open streets with certain specified restrictions, should be limited in its operation by other restrictions contained in the grant of a former power on the same subject. To sustain this objection, would be nothing short of saying that the legislature when it has once acted upon a particular subject, can not confer a new and enlarged power in relation to the same matter without an express declaration, that the actual corresponds with the apparent intent of the grant.
It is objected on behalf of the persons interested in the four last appeals, that the commissioners erred in refusing to allow damages for buildings erected on the site of Furman street since the filing of the map or permanent plan of the village in 18Is). I think the commissioners have given a most reasonable and just interpretation to the act of 1816, under which the survey and map were made; and that this is the only construction which will not render the statute utterly nugatory. The 18th section has been already cited. It provided for a survey and map of the village, with the streets, roads and alleys to be permanently laid out: and the map, when completed and assigned by the president was to be kept by the clerk of the corporation for the inspection of the inhabitants, in order that no resident may plead ignorance of the permanent plan to be adopted, for opening, laying out, leveling and regulating the streets of the said village of Brooklyn.” If it was not intended that the citizens of Brooklyn should take notice of this permanent plan of the village, and govern themselves accordingly, the provision was worse than useless. It led to the expenditure of time and money *368 without securing any important advantages either to the town or its inhabitants. The counsel for the appellants found great difficulty upon [656] their construction to give any practical effect to the provision. It was said that the object of the map was to devise the owner where to place his house so as to. secure the advantages of the street when it should be opened. But the statute, though beneficial to the owner in this particular, went beyond his personal interest, and contained an admonition. Whatever he might judge concerning his own interest,'he was not to plead ignorance of the permanent plan to be adopted for the common benefit of all. It was said also, that the object of the map was only to admonish the owners of land not to make those kinds of improvements for which money will not compensate, as laying out pleasure grounds, and cultivating ornamental plants and flowers. The statute was not passed-for private, but for public purpose. The land owner was not so much as mentioned; and although his just rights were.not disregarded, it would be derogatory to the legislature of 1816 to suppose that they looked exclusively to the advantage of a few individuals. Although the anticipations of that day have been more than realized, the legislature evidently looked forward to the period when Brooklyn was to be a great and flourishing town: and they provided for the opening of new avenues, as the public interests might require, without inposing any unnecessary burden either upon individuals or the town. The owner of land then used for agricultural purposes, was advised on the one hand where to place his buildings, and how to lay out and sell his village lots, so as to derive all the advantages of a now street in prospect; and on the other, he was admonished that if he occupied the designate site of the street with his buildings, he was doing a wrong to others for which he should not be compensated in damages when the time arrived for opening the new thoroughfare. It was further urged that the only design of the statute was to advise the land owner that he might, at some future day, be obliged to sell his property at the appraisal of men; and that if he built upon the site of the intended street, he might be compelled to part with his improvements upon the valuation of others. This, like the suggestions already considered supposes that [657] the legislature had little regard to any other interest than that of the land owner. Selling at the appraisal of disinterested individuals, does not, at least in a legal point of view, mean that the owner is to receive less than the full value of his property. Upon this exposition of the statute, it conferred important privileges upon the land owner, while it deprived him of no right but that of demanding an exorbitant price for his property; and secured no legal advantage whatever to the public. If the legislature did not intend that the street should be opened at a future period without paying for improvements made upon them in the meantime, the provision was worse than useless. It held out to the land holder who mingled with his private interest a just regard for the public welfare, the inducement to conform all his acts to the permanent plan of the enlarged town. It held out to others the inducement to purchase lots and erect buildings along the line of the proposed streets. And yet, upon the construction of the appellants, a single land holder might share all the advantages of this prospective enlargement of the town, and at the same time thwart the expectation of others. By ex-pensive erections he might bring an enormous burden upon others for opening the street, or defect the project altogether. I can not think that the legislature intended to make so unreasonable a provision. It was finally said by the counsel, that it was better to call this provision a mere scare crow, than to make it an instrument of injustice. I can not yield to the argument, that the legislature intended to do a nugatory act; and I have yet to learn that the construction given to the statute by the commissioners can work any injustice. What injury has the land holder suffered? In 1819, a plan was *369 adopted for converting his farm or his waste ground into the site for a great town or city. The course of streets and other public avenues was designated. Public attention was called to the prospective importance of the situation. New inhabitants were invited to the town. Mechanics, traders., artisans and others,, were induced to purchase places for residence or business. Land, which before was only worth a moderate sum by the acre, was rendered valuable for village lots; and ,for all these advantages, and many others which might bo enumerated, what loss or damage did the land [658] holder suffer by the provision in question? None but the privilege of selecting the site of the street as the place above all others most desirable for his store or his dwelling, and making others pay for the building when the street should be opened for public use. He sustained no other injury whatever. Until the time arrived for opening the street, it remained his farm or his garden, with the undoubted right to use it in any way that his interest or his pleasure might suggest, with the single admonition that if he made erections on the site of the street he should not charge the expense to his neighbor. The time for opening the street did not depend upon the will or the caprice of individuals, but was to be decided by the corporation, with a just regard to the public interest; and when the owner was deprived of the use of his property he was to be paid the enhanced value which it had derived from the permanent plan and settlement of the town. In this case, the commissioners have allowed about one dollar on the average for every square foot of land taken for the street, and the owners complain that they have not been allowed more than half enough. Whether commissioners have erred in estimating the value of the land or not, I entertain no doubt that their appraisal exceeds hy more than ten times the value of the same property in 1819; and that is much more than the property would have brought at this time if the survey and map had not been made.
If upon the true construction of the act of 1816, the land owners are not to be paid for the buildings which they have erected on the site of the streets, since the map was filed, it was then objected, that the act Was unconstitutional. It is perhaps a sufficient answer to this objection, that the provision on which it is based, that private property shall not be taken for public use without just compensation, was not contained in our constitution at the time the act was passed and the map filed. If the land was in truth appropriated to public purposes in 1819, there was nothing in the constitution to forbid such a course, however injurious it may have hcen to the owners. But waiving this consideration, the right to take private property for [659] public use, is not conferred by the constitution. It is a right inseparably connected with the sovereign power of the state, in whatever hands that power may reside; and the constitution has only regulated its exercise, by requiring that just compensation be made to the owner. At what time, and in what particular manner, the owner shall receive his recompense, rests in the discretion of the legislature, with no other limitation or restriction than that it shall be just compensation. There is nothing in the constitution, nothing in the natural equity or justice of the case, which forbids that this recompense should be made in property instead of money, or in any other form which secures to the owner a fair equivalent for the land of which he has been deprived. It is upon this principle that benefits were set off against damages under the canal laws, and if the land of a farmer of the Value of one hundred or one thousand dollars was taken to construct the work, and the canal when completed would enhance the value of his remaining property to an equal or greater amount, no other compensation was made to him. A similar provision has been made in many other statutes. It is the only just and reasonable rule on the subject. A different one would tax the public for the benefit of individuals. What then is the case of these *370 appellants ? They have had the uninterrupted enjoyment of their land down to the present time; and now when it is to be taken from them they are to receive a just compensation. A prospective appropriation of the property to the public use was made in 1819; but the land was not then taken, nor were the owners deprived of any privilege whatever, in relation to its beneficial enjoyment, save that of requiring payment for any buildings which they might erect on the site of the streets before the time arrived for opening” them. Admitting that this privilege could not be taken from them without a reasonable recompense, it can not be doubted for a moment that they have received this recompense, and that, too, many times over. There is certainly nothing in the volume of papers before the court to induce a different belief; and if we may resort to conjecture, I doubt not that the [660] act of 1816, was passed on the application of most of the landholders of the village, and that they have derived greater advantages from it than all the other classes of that community. The loss of the. privilege of building on the streets, if it can properly be called an injury, has been greatly overbalanced by the benefits resulting from the permanent and uniform plan which was adopted for the enlargement of the town. There is one test which the appellants might have given, if they had thought proper: What was the vakie of their land before this provision was made; Would that value with compound interest from 1819, to the present time be equal to the sum which had been Awarded to them by the commissioners for the present value of the land ? If not. then whát injury have they sustained by this measure,even on the supposition that the land had been actually taken in 1819? If their damages had been estimated according to the former value, they might have had some ground for complaint; but on the facts which they have submitted, it is impossible to say that any injustice has resulted from the practical operation of this statute. The counsel in discussing this constitutional objection found it necessary to insist that the act of 1807, directing a survey of the upper part of the city of New York, was also invalid (5 Web. 125). This statute has been in operation nearly thirty years, and I am not aware that any landholder on Manhattan island has thought himself aggrieved by it, or that its validity was ever called in question before the present occasion. That it has proved of incalculable value to the city, no one can doubt. ,
The appellant Obadiah Jackson, owns the land in Furman street at its intersection with Fulton street. He objects that Furman street was not surveyed and laid down on the map of 1819, as extending entirely through to Fulton street. He is mistaken in point of fact, as satisfactorily appears by the affidavit of Jeremiah Lott, one of the surveyors. He also insists that a part of his land at the intersection of the two streets was in the East River at the time the act of 1816 was passed, that the property is conse[661] quently within the city and county of New York, and the common council of Brooklyn had no jurisdiction in this matter. Whatever rights of property the corporation of New York may have in the made land on the Long Island shore of the river, there can be no doubt that this territory for all the purposes of police regulations is within the city of Brooklyn (Udell v. The Trustees of Brooklyn, 19 Johns. 175).
The persons interested in the third and sixth appeals object that they have not been allowed anything, or only a nominal sum, for the parcels of land which they severally own at the intersection of Middagh and Furman streets. A similar objection is made by the person interested in the fourth appeal, in relation to his land at the intersection of Cranberry and Furman streets. Jacob M. and John M. Hicks, being the proprietors of a considerable tract of land in the town of Brooklyn, caused the same to be surveyed and laid out into blocks and village lots in the year 1806, and made a map *371 of the land on which they laid down Middagh, Cranberry and several other streets, and this map they filed in the clerk’s office of the county of Kings. They afterwards sold and conveyed village lots, and made partition between themselves in reference to this survey and map and the streets laid down upon it. These streets have since been adopted by the corporation. Middagh and Cranberry streets have beep opened on the hill, but not down to Furman street. There can be no doubt that the land over which these streets are laid has been dedicated to the public by' the original proprietors; and neither they nor their grantees can claim anything but a nominal compensation for the land when actually applied to the public use. They have had their compensation in the enhanced value of the lots which have been sold, and those which may still remain in their hands. This subject has been so much discussed of late, that it can not be necessary to do more than refer to some of the cases (Matter of Lewis street N. Y., 2 Wendell, 472; Livingston v. Mayor of N. Y., 8 Wendell, 85; Wyman v. Mayor of N. Y., 11 Wendell, 486; Underwood v. Stuyvesant, 19 Johns. 181). It was said by one of the counsel that the land in Middagh and Cranberry streets was only dedicated for the purposes of those streets respectively, and that it [662] must be paid for when taken for the purpose of opening Furman street. This makes the right to compensation depend on the contingency whether the one street or the other shall happen be first opened. If the opening of Middagh and Cranberry streets, which has been commenced on the heights, had been continued through to the river, the subsequent opening of Furman across those two streets, would furnish no foundation for the claim. Although it happens that Furman street is first opened, I think that fact can at most only lay the foundation for a claim to nominal damages; and we will not send back the proceedings where the party has suffered no substantial injury. I have thus far proceeded on the supposition that the land owned by the Messrs. Hicks, and the streets laid out by them extended to the East river, or at least across the present site of Furman street; but I do not think that fact satisfactorily established. [The judge here adverted to the evidence upon which his conclusion was founded, and inasmuch as no compensation had been awarded to the owners of the land on the assumption that those streets did extend across Furman street, he expressed the opinion that for this case the report of the commissioners of estimate and assessment should be sent back for review. The judge then proceeded as follows:]
It is said that the persons who appeal in relation to Middagh street, taking all their lands together, have been allowed a full compensation. But as I understand the report, the commissioners have not gone upon that ground. As to a part of the land they have allowed what they deemed its fair value; and as to other parts they have allowed nothing, or only a nominal sum, on the supposition that the owners were not entitled to compensation. Unless a different state of facts can be presented, the report is erroneous in this particular and must be corrected.
It is also said that the commissioners have allowed Jonathan Thompson for all his lands, without any reference to the supposed continuation of Cranberry across Furman street. The commissioners, after describing a lafge lot in the site of Furman street, report that it is owned in fee by Jonathan Thompson, “subject to an easement or right of way for the public generally over and upon so much of the same as lies in and forms a [663] part of Cranberry street.” They then assess the loss and damage of Mr. Thompson “from the said opening and laying out Furman street as aforesaid, by and in consequence of his relinquishing his interest in the last above mentioned and described lot, piece or parcel of land, which is required for the purpose of opening and laying out Furman street as aforesaid” at a certain specified sum of money. It is possible that the commissioners, in *372 making this estimate, wholly disregarded the supposed easement or right of way over Cranberry street; but Mr. Thompson does not so understand the matter. On the contrary, he swears that nothing has been allowed him for the land in the supposed site of Cranberry street. Looking at the language of the report, I think he is warranted in entertaining that belief. Why say that a part of his land was subject to a perpetual easement for the public to pass over it, if that fact was not to be taken into the account in estimating damages? And if it was not in fact taken into the account, why not say ■so? Not only the corporation but the individuals who rnay.be affected are entitled to a full and explicit statement of the grounds on which the commissioners proceed. This course is necessary to protect parries in the enjoyment of their rights, and to afford them ample means for seeking redress when they think themselves injured. I see no reason to doubt that the commissioners, throughout the whole of this difficult and complicated matter, have intended to do equal and exact justice to .all; but they have not, in every instance, succeeded in making their report so plain and unequivocal as the nature of the proceedings requires. It is the more important that the commissioners should state explicitly the grounds on which they proceed, from the consideration that the reviews on appeal can, for the most part only, extend to errors in principle. When a right rule for making the estimate has been settled, it must very often be impracticable for this court -to ascertain whether too much or too little has been awarded to any individual for his damages. In the case under consideration, many of the [664] witnesses differ one half in relation to the true value of the land which has been taken for the street; and the court has no adequate means of arriving at a just estimate. We can only interfere with the report, where, upon the proof, as it appears by the affidavits, there is a plain and decided preponderance of evidence against the judgment of the commissioners. The review then is principally important for the purpose of correcting any error in the grounds on which the commissioners have proceeded; and neither the court nor the party should be left in doubt whether damages were or were not awarded in relation to a particular piece of property, or whether the estimate was affected to any extent by a supposed easement on the land. The report must be corrected so far as it relates to the land of Mr. Thompson, in the supposed site of Cranberry street.
The appellant, Peter W. Radcliff, owns a lot extending from Columbia to Furman street, 150 feet. It is 76 feet 2 inches front on Columbia and 99 feet wide on Furman street. He has a dwelling house fronting on Columbia street, and his rear grounds are laid out and cultivated as a fruit and orna - mental garden. The house and garden are situate on Brooklyn Heights, a very desirable site for private residences; and the appellant states that he purchased the lot and built the house solely for the purpose of providing for himself- and family a permanent residence. Columbia street in front of Mr. Radcliff’s lot is about 73 feet above the tide in the East river, at ordinary high water, and the rear of his lot is about 62 feet above the tide. The hill continues about 22 feet beyond the rear of the lot, and then terminates in a precipitous bank sloping towards the river. Against most of the neighboring lots the high land breaks off nearer to Columbia street, and Furman street may be opened along the base of the hill, near the river, without much excavation. Against the land of the appellant the hill will be cut down about 45 feet, should the new street be opened according to the level established on the survey of Mr. Lott. In relation to this survey it appears that' Mr. Lott, at a meeting of the trustees on the 30th April, 1821, returned a book of the levels of the streets in the village, which was accepted by the trustees, who thereupon resolved, “ that the levels of the .said streets, as laid down in the said book, be and remain the permanent *373 levels in the village of Brooklyn.” The appellant states in relation to some of the streets which have been since opened and regulated, that the profile of Mr. Lott has not been followed, and he submits whether it ought to be regarded as obligatory in relation to the level of Furman street. Believing that any mode which would probably be adopted for opening the new street would deprive him to some extent of the natural barrier or support for the rear of liis lot, the appellant procured from a civil engineer, an estimate of the cost of a stone wall of sufficient height and strength to support the rear of his grounds at their present elevation. According to the estimate of the engineer, a wall of 40 feet elevation will cost about §3300, and one of 50 feet will cost nearly $4800. There will be in the one case a loss of about 6 feet of land in consequence of the necessary slope or batter of the wall, and in the other about 8 feet. On an excavation of 45 feet, the expense of the wall would be about $4000. The loss of land along the rear of the lot will be about 7 feet, making in all nearly 700 superficial square feet, which the appellant values at $2 per. foot. Four individuals have united in an affidavit stating, on the supposition that Furman street is to be cut down to the depth of from 30 to 50 feet, that in their opinion the land of Mr. Radcliff will not be benefitted at all, but on the contrary will be injured by such opening of the street. On the part of the corporation, Thomas W. Birdsall swears that, in his opinion, the earth, as it lies in the bank of the rear of the appellant’s lot, is worth the sum of nine cents per load of ten cubic feet. Silas Ludlam, the city surveyor, has calculated the quantity of earth on excavating the rear of the lot to the level of Furman street; and if the excavation be extended back easterly towards Columbia street for the distance of 50 feet, there will be about 24,000 loads of earth—if extended back. 60 feet, about 29,000 loads; and if extended back 75 feet, there will be about 36,000 loads. Five of the assessors of Brooklyn have severally sworn, that by excavating the rear of the lot to. the level of Furman street, for the distance of 60 or 75 feet towards Columbia street, each lot of 25 [666] feet front on Furman extending through to Columbia street would be . enhanced in value $2000, on account of the great value of sites for stores on the new street, for storage and shipping business; this situation “being opposite to the most crowded part of the shipping of the city of New York and being eminently calculated for accommodation to the said shipping interest, if Furman street shall be opened.” According to these estimates, the value of the appellants’ land will be enhanced by opening the street and excavating the rear of his lot about $7000; and the value of the earth,, on making lots of 60 feet deep on Furman street, will be $2610, and on making lots of 75 feet deep, $3240. The commissioners assessed the appellant for benefit $346'97. Mr. Radcliff insisted before the commissioners that they ought not to proceed until a profile or level of the street had been definitely settled, so that the effect of the measure upon his interest might be accurately understood; and he made an application to the corporation on that subject. He states that one of the commissioners, in the presence of the others, intimated a doubt whether Furman street might not be elevated against the land of the appellant, so as to avoid entirely the necessity of cutting down the bank. The corporation made no final order on his application. Why they omitted to do so does not appear; but their counsel now say that if any profile of the street was either necessary or proper in relation to this proceeding, it had already been established; and that it is the intention of the corporation to regulate the street according to the survey *nd level made by Mr.Lolt, and adopted by the trustees of the village in 1821. rrhe appellant now moves for a mandamus to the mayor and common council of the city, requiring them forthwith to cause a profile to bo made and established of the site of the street, and also requiring them in the mean time to *374 stay all further proceedings in relation to the opening of the street and the estimate and assessment of damages and benefit in consequence of the proposed, improvement. No land or other property will be taken from the appellant by opening this street. If the measure will injure him, his damages [667] are wholly consequential; and it may be doubted whether any provision has been made for such a case. Again, the general object of this proceeding is to acquire the title to the land and buildings in the site of the street, to the end that it may thereafter be opened and prepared for public use. The grading, leveling and paving the street is a distinct proceeding, concerning which a separate provision has been made by law. Act of 1833, §16; Act of 1834, § 40. The injury which the appellant apprehends, will not arise until measures are taken for leveling the street. Conceding that he will ultimately be prejudiced, there is some difficulty in saying that he is entitled to damages on the present occasion. These considerations go alike to the motion for a mandamus and the appeal of Mr. Radcliff. But as the counsel for the corporation did not make the objection, I intend to decide nothing on the subject, but shall consider the case on the supposition that the appellant must be paid his damages, if any have been sustained, and that he has presented his claim at the proper time.
It is a sufficient answer to the motion for a mandamus, that the level of Furman street has already been established by the corporation. The act of 1816 directed a survey and map to be made, “ in order that no resident may plead ignorance of the permanent planto be adopted for opening, laying out, leveling and regulating the streets in the said village of Brooklyn.” The map was completed and filed in 1819. The book of levels was completed and adopted by the trustees in 1821. The appellant says that those levels have not always been followed in opening streets since 1821, and he submits the inquiry whether they are obligatory upon the corporation. I think they are not. But there is the same obligation to follow the level established in 1821, as there would be to follow any new level which might now be adopted. . The authority to regulate, level and pave streets' is in its 'nature a continuing power, or one which does not cease the moment it is once executed. It was given for the purpose of promoting the public safety and convenience; and although the power should never be exercised [668] capriciously or upon light considerations, I entertain no doubt that the corporation may change the level of this or any other street, even after it has been paved or otherwise prepared for public use. The authority of the common council of Brooklyn is at least as ample in this respect as that conferred upon the officers having the charge of highways in the several towns of this state, and it has never been doubted that those officers might dig down hills and fill up valleys for the purpose of improving the highways, notwithstanding it might prove injurious to a particular individual. This question was very fully considered by Chief Justice Parker, in the case of Callendar v. March (1 Pickering, 418). But whether a level once adopted is conclusive upon the corporation, or not, there seems to be no sufficient ground for this application. If conclusive, then the common council can not depart from the level already established. If not conclusive, it is because the corporation has a discretionary power over the subject, and may change its plans as experience and the public welfare may dictate. If a level should now be adopted by the common council, they might in their discretion alter it before the street was actually opened. • In such a case, I doubt whether this court should interfere by mandamus. But it is enough for this occasion that the level has already been fixed, and no further action upon the subject can render it any more certain or conclusive than it is at present.
In relation to the appeal and the proper mode of estimating damages, Mr. *375 Radcliff insists that he has a right to use his property as it is, and for the purposes to which it is now applied; that his land in its original condition being supported on all sides by natural embankments, the corporation can not cut down the bank in the rear for the purposes of opening a street, without providing him with another and a sufficient barrier to uphold his lot in its present condition, so that he may continue that inode of enjoyment which he has already adopted. Upon this principle he claims a sufficient sum to build the necessary wall in the rear; and he denies that the commissioners had any right to regard the new uses to which the land might be advantageously applied in consequence of opening Furman street. In his objections submitted to the commissioners, he says: “ I know indeed [669] that it has been said—and those who have means enough at command to accomplish any enterprise they project, may think it not unreasonable to urge—that by excavating the hill to a sufficient distance from Furman street, and erecting a range of stores there, in such manner as to support the bank, I might accomplish the object without loss and perhaps even advance my pecuniary interests by the operation.” But he submits “ that no calculations of this kind are allowable to excuse the public, or those interested in the improvement, from the duty of compensating for present and inevitable expenditures, immediately or necessarily arising from carrying the improvement into effect. The resort with the requisite funds or hands might prove advantageous, or it might be ruinous; and no one can rightfully be driven to the necessity of trying it.” It is not unnatural that any one in the possession of a highly cultivated garden and pleasure grounds, with a dwelling which overlooks the city and bay of New York, should desire to continue all things around him in their present condition; and to a person who in the evening of a well spent life has retired from the bustle of the city and the pursuit of an arduous profession, to seek repose in such a situation, the thought of being broken up in his final arrangements for life must be peculiarly painful. To his ears it will sound like a sad misnomer to call that improvement, which in its effects will blast the trees and the shrubs and wither the vines and the flowers which his own hands have planted. But however much the necessity for disarranging the plans of any individual may be regretted, the great principle upon which public improvements are to be effected must be substantially the same in all cases. All classes and conditions of men hold their property subject to the paramount claims of the state; and when it is taken lor public purposes, and the question of compensation is presented, the only proper inquiry is, what is its value? The question is not, what estimate does the owner place upon it, but what is its real worth, in the judgment of honest, competent and disinterested men? The use to which the owner has applied his property is of no [670] importance beyond its influence upon the present value. If highly cultivated, it will be worth more than though it had been suffered to run to waste. I can not yield to the argument that the commissioners were bound to regard only the use to which the property is now applied, and pay the appellant a sufficient sum of money to secure him in that mode of enjoyment for the future. They might properly take into consideration the more advantageous use to which the property may be applied in consequence of opening the new street. In a case like this, the proper mode of adjusting the question of damages is to inquire, what is the present value of the land, and what will it be worth when the contemplated work is completed. In deciding these questions, neither the purpose to which the property is now applied, nor the intention of the owner in relation to its future enjoyment, can be matters of much importance. In both cases the proper inquiry is, what is the value of the property for the most advantageous uses to which it may be applied. If a man suffer his land to lie open and unimproved, that *376 will not authorize the commissioners to say that it is worthless. They must award what the land would be worth in the hands of another who would cultivate or improve it; that is its value to the owner, because he can procure that sum of money for it. And in estimating the probable influence of any public improvement upon the value of land, the commissioners should not regard so much the intention of the owner in relation to theffuture use, as they should the purpose to which the property may be applied in the hands of one who is disposed to make it yield the greatest income. What price will it bring in the market? That is the proper inquiry in a proceeding of this kind. As between individuals, the owner may demand any price however exorbitant, for his property; but when it is taken for public purposes he can only demand its real value. That value cannot depend in anj'degree on his own will. To allow either his judgment or his fancy in relation to the proper use of the property to influence the question, would be to make the estate either more or less valuable as it might happen to be pos[671] scssed by one individual or another. In relation to the several persons who will be affected, the commissioners are required to make *•' an estimate of the damages, and an assessment of the benefit which will be sustained, and derived by them respectively from such improvement.” It is the influence of the improvement upon the actual value of the property which the commissioners are to consider. If the property will be more valuable when the work is done than it was before, the owner will not sustain any damages, but will derive a benefit from the improvement. He may not choose to avail himself of the advantages which might be derived from the new state of things around him. The appellant is no doubt averse to a change in the use of his grounds on Furman street from horticultural to commercial purposes; and he prefers to retain instead of parting with his property; but these considerations can have no just influence as between him and the public. There can be no other practical guide for the commissioners than the intrinsic value of the land; and that value depends on the uses to which it may be applied, or the price which it will bring in the market. The appellant may build a wall and continue in the enjoyment of his garden; but upon no legal principle can he charge the expense to the public, if, by adopting another course, he might avoid the necessity of incurring it. If in truth this lot will be more valuable after the street is opened than it is at present, what might be the effect of adopting the rule insisted on by the appellant? After receiving four or five thousand dollars to pay the expense of erecting a wall, he may change his purpose, and either apply his land to commercial uses, or sell it to some one else who will do so. It must be apparent that he ought not in that event to retain the four or five thousand dollars; and yet there would be no means of recalling it. I entertain no doubt that the appellant really wishes to continue the enjoyment of his grounds in their present condition. But he may very honestly change his purpose; and if he do not, those who come after him may do so. The commissioners have no means for arriving at the actual intention of the owner in [672] relation to the future use of his property; and whatever may be his purpose, it can furnish no practical rule for determining their judgment.
The appellant alleges that the commissioners proceeded on the ground of a want of power to award damages in his case. However the fact may be, I find no foundation for the objection in the proofs submitted, and consequently can not interfere with the report on that ground.
It is further alleged that the commissioners did not understand that the street was to be reduced to the level established on the survey of Mr. Lott. There appears to be some foundation for this suggestion. Indeed, it seems doubtful whether-either the common council or the commissioners knew at *377 the time that there was such a thing as a book of levels on file. The appellant urged that the level should be established before any estimate or decision was made in relation to his case. The commissioners admitted the propriety of that course. The corporation received a petition to that effect, and referred it to the street committee. The petitioner was heard before the committee, and no objection was suggested against the measure. But nothing was finally done. No one mentioned the book of levels; and one of the commissioners, in the presence of the others, intimated a doubt whether the street might not be elevated against the land of the appellant, so as to avoid entirely the necessity of cutting down the bank. If the commissioners did not know what general plan was to be followed in opening the street, they could not have been very well prepared to judge of the influence of the measure upon the value of the appellant’s property. They have allowed him no damages, but have charged him with $346'97, for the benefit to be derived from the improvement. It is now understood that the street will be opened according to the level established in 1821, and without intending to intimate any opinion concerning the weight of. evidence in relation to the probable influence of this measure upon the property of the appellant, I think it proper to direct the commissioners to revise their proceedings in his case.
The appellant, Frederick T. Peet, owns a lot adjoining Mr. Radcliff, on the .south, 62 feet 1 inch front on Columbia, and 62 feet 2 inches wide on Furman street. He has been assessed for benefit $219'91. [673] In all other respects the two cases are substantially alike, and the same order will be made in both.
The persons interested in the four last appeals severally object that they have not been allowed a sufficient sum for the property taken for the purpose of opening the street. The witnesses who have been sworn on the one side and the other differ very widely about the value of the property. It is possible that injustice has been done; but on a careful review of the testimony, I am unable to say, in relation to either of the appeals, that the weight of evidence is against the report. We can not, therefore, allow this objection to prevail. But as the report must go back upon other grounds, the commissioners may in their discretion re-consider the claims of any party to the proceedings; and if, upon more mature reflection, they shall be satisfied that an error has been committed, they will undoubtedly make the proper correction.
The motion to confirm the report must be denied, and it must be referred back to the same commissioners for revision and correction. .The order will direct a review in relation to the several objections which have been allowed; and the commissioners will be at liberty to correct the report in any other particular, if they shall deem that course either necessary or proper.
Order accordingly.