ROBERT FORSYTH, APPELLANT, v. JOHN REYNOLDS, JOSIAH E. McCLURE, AND JOHN McDOUGALL.

By two acts, passed in 1820 and 1823, Congress granted a lot in the village of Peoria, in the State of Illinois, to each settler who "had not heretofore received a confirmation of claim or donation of any tract of land or village lot from the United States.
Lands granted to settlers in Michigan, prior to the surrender of the western posts by the British government, and which grants were made out to carry out Jay's treaty in 1794, were not donations so as to exclude a settler in Peoria from the benefit of the two acts of Congress above mentioned.

THIS was an appeal from the Circuit Court of the District of Illinois, sitting as a court of equity.

The case was this.

On the 4th day of June, 1850, John Reynolds, Josiah E. McClure, and John McDougall, appellees in the court, filed their bill in the Circuit Court of the United States, for the district of Illinois, against Robert Forsyth, appellant in this court.

The bill sets forth that the complainants claim title to a tract of land situated in the village of Peoria, State of Illinois, and particularly described in said bill, their claim of title commencing with a patent from the United States to one John L. Bogardus, on a preëmption established by him at the land office, in Quincy, Illinois; said patent bearing date January 5, 1838; a copy of which, and also of all the intermediate conveyances from Bogardus to said complainants, are filed with said bill, as exhibits.

The bill also avers that said complainants have been for several years in possession of said land, and made valuable improvements thereon, amounting to over three thousand dollars.

The bill further sets forth that in the year 1848, Robert Forsyth commenced an action of ejectment in the said Circuit Court of the United States against one James Kelsey and Joshua P. Hotchkiss, then occupants of said premises, for recovery of a portion of said premises, to which the said Forsyth claimed title under French claim number seven, in said village of Peoria, which claim covered the larger portion of the premises above referred to; the said Forsyth claiming by virtue of an act of Congress, approved May 15th, 1820, entitled "An act for the relief of the inhabitants of the village of Peoria, in the State of Illinois," and also by virtue of another act of Congress, approved March 3, 1823, entitled "An act to confirm certain claims to lots in the village of Peoria, in the State of Illinois," in pursuance of which acts a patent issued on the 16th December, 1845, to the legal representatives of one Thomas Forsyth, and to their heirs, a copy of which patent is filed as an exhibit with said bill.

The bill further alleges that said Robert Forsyth, derived all

his title to said French claim by inheritance from the said Thomas Forsyth, the said Robert being one of the sons of the said Thomas, and by purchase from the other heirs of the said Thomas.

The bill further charges that the act of Congress of March 3, 1823, before referred to, excluded the right or claim of any settler in the village of Peoria, who had, before the date of the said act, received a confirmation of claims or a donation of any tract of land or village lot from the United States, and that the grant made by said act was only to such settler, provided he had not received any prior grant, confirmation, or donation.

The bill further charges that, by a regulation of the General Land Office, the appellant, Forsyth, in August, 1845, filed an affidavit with the Receiver of the Land Office, at Edwardsville, to the effect that Thomas Forsyth had not received a prior confirmation or donation, and that said Thomas Forsyth was an inhabitant or settler on lot seven, within the meaning of the act.

The bill further charges that the claim of the said Robert Forsyth, made before the Register of the Land Office at Edwardsville, Illinois, on the 7th September, 1820, and the evidence in support of said claim, show that the same was made by said Forsyth in his own right, and not as the legal representative of any other person.

The bill further charges that the said Thomas Forsyth had, prior to the passage of the act of the 3d March, 1823, received from the United States donations and confirmations of two claims in the Territory of Michigan, under an act of Congress entitled "An act regulating grants of lands in the Territory of Michigan," approved March 3, 1807, and that patents for said claims, were duly issued to the said Thomas Forsyth, in the year 1811, certified copies of which patents are filed as exhibits with said bill.

The bill, after propounding certain interrogatories, concludes with a prayer for a perpetual injunction against the said Robert Forsyth, restraining him from prosecuting his said action of ejectment.

The patent, after the usual grant to Bogardus, concludes with the following proviso: "subject, however, to the rights of any and all persons claiming under the act of Congress of 3d March, 1823, entitled "An act to confirm certain claims to lots in the village of Peoria, in the State of Illinois."

The patent recites Thomas Forsyth as claiming "under John Baptist Maillet, and in right of his own occupancy and cultivation," and also recites that it appears from the certificate of the register that "John Baptist Maillet was the inhabitant or settler within the purview of said act of Congress of 1823," and that it

has appeared to the satisfaction of the register and receiver that the said inhabitant or settler did not, prior to said act of 1823, receive a confirmation of claims or donation of any tract of land or village lot from the United States, and that the legal representatives of said Thomas Forsyth, under said Maillet, in virtue of the confirmatory act aforesaid, are entitled to a patent."

On the 31st August, 1850, Forsyth filed his answer, admitting the possession of the premises by complainants, as stated by them, and that the value of the improvements was three thousand dollars, as stated by complainants, that the action of ejectment was brought, as stated in the bill, and that the complainants claimed title under the Bogardus patent.

The answer further sets forth that respondent claims title to the premises, by settlement and occupation, of John Baptist Maillet, previous to the year 1790, and from that time to 1801, and a sale of such possession and occupancy to John M. Coursell, and from him to Thomas Forsyth, and Forsyth's occupancy, under such purchases, from 1802 to 1812; also, by the act of Congress, of May 15th, 1820, above referred to; also, by the report of Edward Coles, Register of the Land Office at Edwardsville, Illinois, in pursuance of said acts of Congress, said report, properly authenticated, being filed with the answer; also, by the act of Congress of March 3, 1823; also, by the survey of the village of Peoria, and of said premises, by the surveyor of public lands in Illinois and Missouri, plats of which are filed with said answer, marked " B " and " C;" also, by the patent to Thomas Forsyth, exhibited with said bill, and by devise from said Thomas to Mary, the sister of respondent, and by death of said Mary without issue, whereupon the premises descended to respondent and his brother, and, by deed, to respondent from his brother, for his interest, duly certified copies of the will of Thomas Forsyth, and of the deed from respondent's brother to him, being filed as exhibits with the answer, and the heirship of respondent and his brother fully appearing in the proof.

The answer further states that respondent can produce no deeds from Maillet to Coursell, and from Coursell to Thomas Forsyth, and that it was the custom among the French inhabitants, prior to 1812, to transfer the occupancy of real estate by verbal contract and delivery of possession merely.

The answer further states that respondent knows nothing of the donations and confirmations mentioned in said bill as having been made to said Thomas Forsyth, in Michigan, and never heard of such except from said bill, or a short time before it was filed.

The answer further sets up that said Bogardus never occupied said premises in his own right, but as tenant to one Jacques Mette, and that the said Mette had, on the 4th day of March,

1847, received a patent from the United States for that portion of the premises occupied by said Bogardus, and therefore said Bogardus having never occupied said land in his own right, but only as tenant to said Mette, the said preëmption claim of Bogardus, and the patent issued thereon to him, were void, of all which the answer avers the complainant had notice.

The answer further sets up that even if it should appear in proof that the Thomas Forsyth, referred to in said bill, and respondent's father were the same person, and that said Thomas Forsyth did receive the confirmations in Michigan, described in said bill, nevertheless, said confirmations would not prevent the said Thomas Forsyth from holding said premises in Peoria, under a proper construction of the act of 3d March, 1823.

Exhibits were filed with the answer and proof taken, showing the defendant's title under Thomas Forsyth.

On the 7th June, 1850, the complainants filed an amendment to their bill, setting forth that the John Baptist Maillet mentioned in the patent to the legal representatives of Thomas Forsyth, died about the year 1801, and that neither the said Maillet nor his legal representatives, nor any other person, except the said Thomas Forsyth, ever presented any claim to said lot seven before the officers of the land office at Edwardsville, under the provisions of the acts of Congress before referred to.

On the 26th December, 1850, the respondents filed an answer to the amendment, admitting the death of said Maillet, as therein stated, but insisting that Thomas Forsyth was the legal representative of said Maillet, and authorized to claim said premises before the land officers at Edwardsville, under the act of Congress.

Much proof was taken, by the complainants in the case, to show the identity of the Thomas Forsyth who received the confirmations in Michigan, with the Thomas Forsyth to whose legal representatives the Peoria lot was patented, and who was the father of Robert Forsyth, the defendant.

The defendants took the depositions of Lisette Mette, Antoine Smith, Joseph Aubuchon, Sarah Bouchie, and others, by whom it was clearly proven that about sixty years ago John Baptist Maillet occupied the premises at Peoria; that he sold to Coursoll; that Coursoll sold to Thomas Forsyth, who continued to occupy the lot; that these sales were made in the ordinary mode of selling real estate among the French at Peoria at that time, by verbal sale and delivery of possession.

The said Lisette Mette also proved that the said Robert Forsyth, defendant, was the son of said Thomas Forsyth, that she was present at his birth, which took place on the lot in controversy.

It is also proven that Thomas Forsyth died in 1833, leaving three children, to wit: Thomas, Mary, and appellant, and that Mary died without issue, leaving Thomas and appellant her sole heirs. There is no controversy on this point.

The case was heard before the district judge, holding the. Circuit Court at the December term, 1852, who decreed a perpetual injunction against the defendant Robert Forsyth, enjoining him from prosecuting said action of ejectment, the decree being on the ground that the confirmation in Michigan to Thomas Forsyth rendered invalid the Peoria patent to his legal representatives, under the act of March 3, 1823.

From this decree Forsyth appealed to this court.

The cause was argued by *Mr. Williams*, for the appellant. Briefs were also filed upon that side by *Mr. Lincoln* and *Mr. Gamble*. *Mr. Chase* argued the case for the appellee; and a brief was also filed by *Mr. Purple*.

The following is the notice of the main point in the case, taken from one of the briefs on the part of the appellant.

The objection made to the patent to Forsyth's representatives is, that Forsyth in his life obtained two confirmations for lands in Michigan Territory.

If the act of 1823 designed to exclude from the grant all settlers who had previously received confirmations or donations of lands or lots, in any part of the Territory of the United States, such design was strangely singular. If it excludes all who had received confirmations, it excludes them without reference to the character of the title confirmed or the consideration for the confirmation. It would place on the same footing, those who, under treaties made by the United States with foreign nations, had obtained confirmations of titles which the United States were bound to confirm; and those who had received from the United States lots or lands as mere gratuities. It should not receive a construction that would make it operate so absurdly, unless such construction is unavoidable. No similar act, with such a restriction upon its operation, can be found among the acts of Congress. It is apparent, from the history of the Michigan titles of Thomas Forsyth, which are employed in this case to defeat the title to this lot in Peoria, that if they can have the effect given to them by the Circuit Court, then a confirmation of a Spanish grant in any part of Louisiana, made by the United States under the clear obligation of the Louisiana treaty, would equally defeat a title to a lot in Peoria claimed under the act of 1823.

The titles in the Michigan land, held by Thomas Forsyth,

were held under the second section of the act of March 3d, 1807, (2 United States Stat. 438,) and they were founded upon possession and improvement of the property prior to July 1st, 1776. The tracts are situated at Gross Point, in the Detroit district. Now, the part of Michigan Territory, in which this land was situated, had been occupied by the British authorities up to June or July, 1796, and the possession and improvement of the land which were to be the basis of the title under the act of 1807, were under British sanction.    How then did such occupancy of property, undoubtedly within the territorial limits of the United States, become the foundation of a grant by our government?    The treaty of 1794, which provided for the evacuation of all places within our territory occupied by the British troops, required, in its second section, that traders and settlers should be protected in the enjoyment of their property, and should be free to settle the same or retain it for their own benefit.    This obligation, assumed by the treaty, was recognized and discharged by the act of 1807, as far as that act extended, and the titles thus acquired were not mere gratuities, but had for their consideration all stipulations in the treaty which our government regarded as beneficial to itself.    In respect to their consideration, these titles stand upon the same footing as any others which have been acknowledged and confirmed by our government, under any of the treaties by which we have acquired territory, and by which we become bound to acknowledge and perfect the titles initiated under the former government.

When an individual has acquired a title from our government under the obligation of a treaty with a foreign nation, and therefore for a consideration which that foreign nation has given, we would not expect our own government to make the title, so acquired, a ground for excluding that citizen from any benefit conferred upon a class of citizens in a distant part of the country, upon altogether different considerations, when he belongs to the class intended to be benefited, and has himself given the consideration for the benefit.    It would appear to be an unnatural supposition that such was ever the design of our government.

The language of the act of 1823, which excludes from the benefit of the grant those who have obtained previous confirmations or donations, does not require such construction as would exclude a person claiming property in Michigan under the act of 1807.    A title to property in Michigan under that act is not a donation, for it rests upon the considerations that moved two sovereign powers to the conclusion of a treaty.    The term "confirmation" is applied in different acts of Congress to titles of different origin.    In the second section of the act, 3d March, 1807, in relation to and titles in Louisiana, it is used with

reference to titles where there is no other foundation for the claim than possession. 2 United States Stat. 440. In the first section of the act 13th June, 1812, (2 United States Stat. 748,) it is applied in like manner to rights, titles, and claims, resting only upon possession. There are very many acts in which the term is used for the purpose of perfecting claims, when, according to law, the person in possession of the property had no title to it, or right to the possession, and therefore, in such case, the confirmation is a mere gratuity.

The counsel for the appellees thus briefly noticed the point in question.

The claims confirmed to Forsyth, at Gross Point, under the act of the 3d March, 1807, are of the same class and character as the one which he now seeks to enforce in Peoria. Settlement and occupation were necessary to establish the validity of both. No other claim, equitable or legal, is advanced in favor of either. In the one case, the right depends upon a settlement prior to the 1st day of January, 1813; in the other, upon a settlement, and continued occupancy, from before the 1st day of July, 1796, to the passage of the act of 3d March, 1807. In neither case, at the time of the passage of the acts, had the settlers or occupants any title to the lands, derived from any source which the Government of the United States were legally or morally bound to respect. Both were gratuities — mere boons; not at all allied to those cases where grants, concessions, or donations have been made by the officers of foreign governments, under the authority of such governments, previous to the time of the acquisition of the Territory in which they were located by the United States.

It is apparent that the object and design of the reservation in the act of 1823, was to prevent any one from becoming the recipient of the bounty of the government, in lands or lots, more than once; and it is not confined in its operation to any special location, or particular class of cases.

Mr. Justice CATRON delivered the opinion of the court.

The bill seeks to set aside a patent to the legal representatives of Thomas Forsyth, because he had obtained from the United States two other donations of land situate in Michigan, previous to his donation of the village lot in Peoria; and it is alleged that for this reason, his donation certificate and patent were fraudulent, as against the complainants, and should not be set up to their prejudice; and so the court below held.

Waiving, for the present, all consideration of the fact that Forsyth claimed the village lot as assignee of Maillet, who had not obtained any pre 'ous " confirmations, or donation;" and

secondly, that the patent to Bogardus was made subject to the rights of all persons claiming lots in Peoria, under the act of 1823; and placing the case on the ground that the Circuit Court did, and then how does the claim to relief stand?

It was assumed by the court below, that Forsyth had received as a donation, the two tracts of land in Michigan, within the meaning of the act of 1823. That the act contemplated a donation we think is true.

A donation is a gift and gratuity, and not a grant of land founded on a consideration, as where the government is bound to make it by treaty stipulation conferring mutual benefits. Thomas Forsyth and his family were Canadian settlers and British subjects, residing on our side of the line, established by the treaty of peace of 1783; they professed allegiance to Great Britain, as all that population did at the date of Jay's treaty, in 1794, and up to July, 1796.

By the sixth article of the treaty of 1783, it was provided that no one should suffer by reason that they took part with Great Britain in the war, "in person or property."

As Great Britain held possession of the country in Michigan, regardless of the treaty of 1783, a principal object of Jay's treaty was to obtain actual possession, and to do this it was necessary to secure the removal of the British troops, and an evacuation of the military posts of that power from our side of the line.

The second article expressly provided for these objects, and at the same time, and as matter of justice, it was declared, that all settlers and traders, within the precincts or jurisdiction of said posts shall continue to enjoy, unmolested, all their property of every kind, and shall be protected therein by the American government; that they may sell their lands and houses, or retain the property thereof at discretion; and that those who continue in the country for one year, after the date of the treaty, shall be considered as having elected to become citizens of the United States.

The 9th article is reciprocal and general, and further provides that British subjects holding lands in the United States shall continue to hold them, according to the nature and tenure of their respective estates and titles therein, and that they may sell or devise the same as if they were natives.

As, from 1783 to 1794, no title could be made by Great Britain to lands on our side of the line, within the jurisdiction of the posts, it was for mere settlers, to a great extent, that the 2d article of the treaty provided: persons residing there usually having no other evidence of title than possession, improvements, and actual residence on the land.

To execute in good faith this part of the treaty, Congress pro-

31 *

vided, by the act of March 3, 1807, (sec. 2,) that to every person or persons in possession at that date of any tract of land, in his own right, in Michigan Territory, which tract of land was settled, occupied, and improved by him or them prior to the 1st day of July, 1796, or by some other person under whom he or they hold or claimed the right of occupancy or possession thereof, and which occupancy or possession had been continued to the time of passing that act, then the said tract or parcel of land thus possessed, occupied, and improved, should be granted, and such occupant should be confirmed in the title to the same as an estate of inheritance in fee-simple.

The act of 1807 pointed out the mode by which those seeking title under it should proceed. Forsyth's two claims were brought strictly within the terms of the act; he got certificates from the commissioners to that effect, and in 1811 obtained his patents.

The larger tract of 600 acres he claimed by a deed of conveyance from his father, William Forsyth; and the other tract for 336 arpens he held, as one of his father's heirs, by a deed of partition. Both tracts front on lake St. Clair, and were within the jurisdiction of the British posts.

We suppose it is free from controversy, that these two tracts of land were the property of Thomas Forsyth, in 1807, by virtue of the treaty of 1794, and just as plainly property as lands held by a concession in Louisiana, under the Spanish government, by force of the treaty of 1803.

In neither case could a donation be assumed to have been made. As Forsyth obtained no donation in Michigan, he was not within the prohibition prescribed, by the act of 1823, to settlers in the village of Peoria, and, therefore, the decree below must be reversed, and the bill dismissed, but without prejudice to either party, in prosecuting and defending the suit at law, sought to be enjoined by the bill, in regard to matters not hereby decided.

### *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States, for the District of Illinois, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court, in this cause, be, and the the same is hereby, reversed, with costs, and that this cause be, and the same is hereby, remanded to the said Circuit Court, with directions to dismiss the bill of complaint without prejudice to either party, in prosecuting and defending the suit at law, sought to be enjoined by the bill, in regard to matters not hereby decided.