## The People v. Catharine H. Jones.

If the owner of land do such acts as show, unequivocally, an intent to dedicate his land to the public for a highway, such dedication, if properly accepted, will make the land dedicated a public highway, without reference to any particular period of time.

In determining whether there has been a dedication, all the acts of the owner bearing upon the question are to be considered together. One act may be explained or qualified by another.

A dedication can not be made without an intent to dedicate, clearly manifested.

It is essential to a dedication that it be accepted by the public. In the case of city streets, the acceptance should be manifested by some act of the authorities, either formally confirming the dedication and ordering their opening, or exercising authority over them in some of the ordinary ways of improvement or regulation.

The adoption, by the Governor and Judges of the territory of Michigan, of the plan of the city of Detroit, in 1807, did not, of itself, make public highway of that portion of the projected streets which was covered by private claims, and occupied as private property.

The power of the Governor and Judges to convey lots in the town of Detroit, was not confined to a conveyance of lots in such forms and dimensions, as they should delineate them upon their plan. Under the acts of Congress empowering them to adjust claims to lots therein, and give deeds for the same, the claims to be adjusted were such as any person might have, legal or equitable. When satisfactory proof had been made, they had no right whatever to deprive a claimant of any portion of the land actually belonging to him under the acts of Congress, passed to protect ancient titles and settlements, whether it interfered with any projected plan or not. And no court has a right to go behind their conveyances, so long as they acted within the jurisdiction vested in them by Congress.

The adoption by the Governor and Judges of the plan of Detroit was not intended by them to be a final and absolute act, which could not be reviewed or explained. It was liable to modification by interfering claims and reserves; and, when circumstances might render it necessary to adapt the plan to these contingencies, they had the power to do so.

THE PEOPLE v. JONES.

That portion of Shelby street between Jefferson Avenue and Woodbridge street, as projected on the plan, being at the time of the adoption of the plan claimed and occupied as private property, and so continuing to be claimed and occupied thereafter; and the corporate authorities of Detroit having, many years after the adoption of the plan, under their authority to lay out streets through private property, caused a street to be opened along it, but of less width than the street as originally projected, paying the occupants of the land for the strip so taken; — *Held,* That this was a waiver of any rights of the corporate authorities, if any they had under the plan, to that portion of the projected street outside the lines of the street so opened.

*Heard November 23d and 24th.    Decided December 9th.*

Case reserved from Wayne Circuit.

The facts are sufficiently stated in the opinion. .

*J. M. Howard, Attorney General,* for the People:

1. The legal effect of the adoption by the Governor and Judges of the plan of Detroit of 1807, was an actual and present dedication of the ground as streets delineated as such on the map.

The United States were, at the time, the actual owners of the lands embraced within the limits of Detroit, and had an undisputed right to grant or dedicate it, as they should see fit. They saw fit, by the act of 1806, to authorize the Governor and Judges, or any three of them, *to lay out a town,* to include the whole of the old town of Detroit. This was a special authority conferred upon the Governor and Judges, wholly distinct from, and independent of, their legislative authority. In its exercise they were merely the agents of the Government. Their acts were its acts. Their streets and alleys were the streets and alleys of the United States. The act did not authorize them to change any dedication they had made; nor could they do so in their legislative capacity, for the act of dedication not being their own, but that of the United States, it was, when done, necessarily beyond their reach. Indeed, the law does not allow the party making it to revoke a dedication. — 5 *Sandf.* 587.

The resolution of the Governor and Judges, adopting the plan, made this a highway for ever. — *People v. Carpenter,* 1

*Mich.* 278; *Brig Empire State,* 1 *Newb.* 541; *Barclay v. Howell's lessee,* 6 *Pet.* 498; *Cincinnati v. White's lessee, Ibid.* 440; *People v. Beaubien,* 2 *Doug. Mich.* 283.

Detroit was, at this time, a town-corporate. Its trustees had power, by the charter, to cause the streets, lanes, &c., to be kept open and in repair, and free from nuisances; and the dedication was, of course, made in view of the fact that they might, at any time, enter upon the ground for the purpose of repairing and improving it as a street.

2. Actual *user* as a highway was not necessary to complete the dedication. — 6 *Pet.* 498; 2 *Doug. Mich.* 283; *Commonwealth v. Rush,* 14 *Pa. S. R.* 186; *Matter of Thirty-second Street,* 19 *Wend.* 130; *Rowan's ex'rs v. Portland,* 8 *B. Monr.* 232.

3. The deed to Beard was, so far at least as this street was concerned, entirely ineffectual. The act of 1806 authorized the Governor and Judges to sell, not streets, but *lots,* — *i. e.* parcels of land which they should, in laying out the town, designate as such. This is plainly the extent of their statutory power to sell. Besides, the act of dedication was, in its nature, irrevocable. — *Pitcher v. N. Y. & E. R. R. Co.* 5 *Sandf.* 587; *Adams, v. S. & W. R. R. Co.* 11 *Barb.* 414; *State v. Woodward,* 23 *Vt.* 92.

4. No presumption of an abandonment of their right by the public arises from the omission to open and work the street. No length of time can legalize a public nuisance. — 1 *Chit. Cr. L.* 160; 1 *Russ. on Cr.* 305; *Weld v. Hornby,* 7 *East.* 199; *Mills v. Hall,* 9 *Wend.* 315. If it could, and thereby give the offender, or his successor, a prescriptive right against the public, the principle would be inapplicable to a case like the one at bar, where streets were laid out for the *future,* not for the present — and with full knowledge that generations must pass away before all these streets would be actually used.

*G. V. N. Lothrop*, for defendant:

1. The platting, by the Governor and Judges, no more *ipso facto* established public highways than does the act of an individual who plats a piece of private property into lots, streets, and alleys. Such platting is not necessarily nor usually a dedication. *It simply contemplates a future dedication*, and this plat is but the first step towards it. He intends afterwards to open it, and sell lots along the proposed street. And when this is done, and not before, it can be said that there is a dedication.

The object of the plan in question was to lay out the city into lots, with a view of adjusting titles, and, by deed, conveying the lots as provided in the act of Congress. It was the adoption of a general plan which should furnish the groundwork for shaping into some system the work of these magistrates in adjusting and making titles. It was nothing more nor less than a proposed chart for the guidance of their future action. It was the plan of the city as they *proposed* it *should be*. So far as they could carry it out in their subsequent action, it became the *actual* plan of the city. When they should adjust titles, and sell and convey lots according to the proposed plan, they would thereby recognize and establish that part of the proposed plan—thereby recognize, establish, and *dedicate* the streets and alleys which were adjacent to such lots, and contemplated as adjacent to the same.— *May v. Tillman*, 1 *Mich.* 263; *U. S. v. Chicago*, 7 *How.* 185; *Oswego v. Oswego Canal Co.* 2 *Sel.* 257; *Badeau v. Mead*, 14 *Barb.* 329; *Clements v. West Troy*, 16 *Barb.* 251; *Bailey v. Copeland*, *Wright*, 150; *Matter of Twenty-ninth Street*, 1 *Hill*, 189.

2. But, conceding that the plan of the Governor and Judges had the effect claimed, we say that the premises in question ceased to be a highway long ago. After this long period of non-user and exclusive private occupancy, it will be presumed that the right is extinguished or

abandoned.—*Beardslee v. French,* 7 *Conn.* 125; *Fox v. Hart,* 11 *Ohio,* 414. Especially should this be so when the only ground for assuming that a highway ever existed is a naked laying-out on paper.

3. By the laws of 1833 (*p.* 110), if any highway already laid out should not be opened and marked in six years, and by the statutes of 1838 (*p.* 127) in four years, it ceased to be a highway for any purpose. These statutes seem to us decisive of this question, if the proposed street was ever a highway. They would also settle the period within which the Court might presume an abandonment of a highway, in a case where the statute did not, in terms, apply.

CAMPBELL J.:

The defendant was indicted for obstructing an alleged highway, described in the indictment as leading from Jefferson Avenue to the Detroit River, in the city of Detroit, and known as Shelby street. A special verdict was found, and the liability of the defendant to judgment upon that verdict, is the question reserved for our opinion.

From this it appears that in the year 1807 the Governor and Judges adopted a plan of twelve sections, in separate parts — section 3, embracing the land in controversy, having been adopted April 27th, 1807; and on the same day a resolution was adopted that the plan of this section, and of sections 1, 2, 4, 6, and 8, "be confirmed, and be a record, and that they be signed by the President of the Board, and be attested by the Secretary in identification; and that no alteration be suffered therein without an order of the Governor and Judges to that effect." The section in question is bounded north by Jefferson Avenue, and east by Woodward Avenue. A street parallel with Jefferson Avenue has long been, and is now, open according to the plan, as far as the street below the land in controversy. The plan calls for its continuation a considerable distance further, to the west boundary of the plan. The jury find that the street and alley spaces on this section have never

been, except in part, opened, used, and recognized in fact as
streets and alleys: That what is claimed as Shelby street in
the indictment is represented on the plan by a space of sixty
feet in width, reaching from Jefferson Avenue to the river:
That on January 16th, 1811, upon the application of Aaron
Greeley and David Beard, to purchase the lands in front of
their respective lots in the old town of Detroit, between the
Merchants' and Public Wharf, an order was made to sell to
them, at a certain rate per square foot, subject to the new
plan of Detroit, and all intervening claims; and a deed was
accordingly made to David Beard of a tract embracing the
premises in controversy, for a consideration embracing pay-
ment for the whole of it.    This lot extended to the street
parallel with Jefferson Avenue, now known as Woodbridge
street.   In the *habendum* clause of the deed, it was made
subject to the new plan of Detroit, and all interfering claims
At the date of the deed, the water came nearly or quite up
to Woodbridge street at the intersection of Shelby street, and
nearly all the premises conveyed were under water.   Since
that date, Beard and his grantees (the defendant being such)
have continuously claimed and occupied the whole premises
as private property; and the land was reclaimed from the
river, and buildings erected upon the alleged street, as early
as 1816, and continued there ever since.   In 1819, the building
now complained of was erected in the alleged street space,
and has been maintained there to this time.   So much of the
alleged Shelby street as lies between Woodbridge street and
Jefferson Avenue was never actually opened as a street, ac-
cording to the plan.   The ground over which it was projected
was known as the Dodemead lot, and remained enclosed
and used as private property, until 1828, when the corporate
authorities of Detroit caused a street forty - four feet wide to
be opened through the Dodemead lot, and paid the owners
of the land for the strip so taken.   The premises in question
have always been claimed, reputed, and occupied as private
property.   The building in question has been used as a ware-

house, and a passage has been kept up from Woodbridge street to it, and used by all persons having business at the warehouse and dock. No part has been claimed, or used, or worked by the public; and the whole has been regularly taxed for all various public purposes since 1834. The passage referred to is about thirty feet wide, bounded by buildings on either side, which are in the space claimed as the street in question. The Governor and Judges sold no part of the lands adjacent to the alleged street, by lots numbered according to the plan, and never referred to it as a street subsequently, and never sold property bounding upon it as an actual or supposed street.

The question for our determination, therefore, is whether the land in controversy was a public highway when the building complained of was erected in 1819, and whether it was so at the date of the indictment, which is for maintaining an existing nuisance.

It is claimed by the People that the action of the Governor and Judges, in adopting the plan of section 3, constituted the space marked there as a street, a public highway, operating as a complete and irrevocable dedication of it, in which the public became at once, and perpetually, interested. It therefore becomes necessary to inquire into the nature and effect of their action.

No law has ever declared this strip of land to be a public highway, and there is no statute declaring the effect of making such a map or plan. Our statute relating to town plats requires certain formalities which are not found here. We are therefore left to decide the case upon such principles of law as can be found applicable.

Where the provisions of the statutes for opening streets and roads have not been followed, the common law recognizes the existence of ways by dedication. If the owner of the fee does such acts as show, unequivocally, an intent to dedicate his land to the public for a highway, such dedication, if properly accepted, will make the land dedicated a public

highway, without reference to any particular period of time. But to make out a dedication, it is not only necessary that the act be done by the owner of the land, but all of the acts of the owner bearing upon the question are to be considered together. One act may be explained or qualified by another. This subject was very ably investigated in the case of the *People v. Beaubien*, 2 *Doug. Mich.* 256; and we deem it unnecessary to add any thing to the reasoning of that case. No dedication can be made out without an intent clearly manifested. And it is also necessary that the dedication be accepted. No question can arise as to the necessity of both of these things where the land dedicated is individual property. But the peculiar situation of the property, and the character of the actors, in the case before us, render it necessary to determine whether, under the circumstances presented, these rules are in any way modified; or whether the public capacity of the Land Board does not invest them with a two-fold relation of land-owner and representative of the public, and whether they have not assumed to act in both positions.

The precise point, as to the effect of the adoption of the plan of this section, has not been passed upon. We were referred to the case of the *People v. Carpenter*, 1 *Mich.* 273, as decisive of this controversy. We are, however, unable to perceive how the facts involved there were at all analogous to those in this case. That was an indictment for obstructing Woodward Avenue, which was found by the special verdict to have been opened and used as a highway before the adoption of any portion of the city plan. As a matter of fact, that street, as well as Jefferson Avenue, was made a highway by express statute in 1805, before any authority existed to make a general plan. No question, therefore, arose upon the authority of the Governor and Judges to create highways, or upon the effect of the adoption of the plan in creating them. The act there complained of had never been authorized by any one. The case is therefore no authority, one way or another, upon any point in issue here.

It was decided in the case of the *People v. Beaubien*, that an individual, by making a plan, and selling lots in accordance with it, did not necessarily create the streets upon it high- ways — although he might thereby become liable to his ven- dees. The rights of the public would depend upon the intent to dedicate on his part, and an acceptance of the dedi- cation by the public. Until, by the union of both of these requisites, the public easement had become perfectly estab- lished, no criminal prosecution could be maintained. As to the method whereby acceptance may be manifested, the authorities are not uniform. Where there has been no public *user*, there must, undoubtedly, be some act of the lawful authorities. The courts of several states have held that, inas- much as the local authorities are required to determine what highways are needed for public convenience, and as existing highways always entail more or less expense in repairs, it is contrary to public policy to permit them to be established without the action of these authorities, unless the user be so long that the law raises a presumption in their favor.—*Hobbs v. Lowell*, 19 *Pick.* 405; *Bowers v. Suffolk Manf. Co.* 4 *Cush.* 332; *Wright v. Tukey*, 3 *Cush.* 290; *Page v. Weathersfield*, 13 *Vt.* 424; *Blodgett v. Royalton*, 14 *Vt.* 288; *City of Oswego v. Oswego Canal Co.* 2 *Sel.* 257; *Badeau v. Mead*, 14 *Barb.* 328; *Clements v. West Troy*, 16 *Barb.* 251; *Kel- ley's case*, 8 *Gratt.* 632; *Indianapolis v. McClure*, 2 *Ind.* 147. The case of *Underwood v. Stuyvesant*, 19 *Johns.* 181, lays down this doctrine in regard to city streets in very strong terms. And in all the cases which have arisen in New York, upon town or city ways, this principle has been adhered to. It would certainly lead to strange consequences, if the plan of a city could be placed beyond the reach of its corporate authorities, and varied without their assent. The same mischiefs would not occur in opening rural ways, and there may be no special reason for holding such a rule in regard to them. Our statutes, however, have always made provision that roads not worked within a specified period

shall be discontinued, and therefore the question at common law becomes, as to them, unimportant. Without expressing an opinion whether these statutes apply to city streets, we think that an acceptance of such streets should be manifested by some act of the authorities, either formally confirming the dedication, and ordering their opening, or exercising authority over them · in some of the ordinary ways of improvement or regulation. In the case of the city of Oswego, the plan had been made by the public agents of the state, yet the rule was held to apply.

We now proceed to examine into the circumstances of the case before us.

It appears that the Governor and Judges made a plan, adopting different portions of it at different times, embracing all lands, whether public or private, within its bounds. It was a symmetrical paper plan, as the facts show, made, as is apparent from the face of it, without any actual survey upon the ground. Portions of it were in the water, and portions of it, as subsequent public legislation shows, covered reserved lands and private farms. By the act of the Northwest Territory incorporating the town of Detroit, passed in 1802, its corporate limits embraced at least two farms—the Askin, or what is now known as the Brush farm, and the Macomb, now known as the Cass farm. A fort was at the time existing by authority of law, and military reservations, recognized and defined by subsequent acts of Congress and of the territory, were scattered over portions of the town. The plan covered all these lands indiscriminately; and, on paper, the streets, alleys, and other open grounds extended over much territory which the Governor and Judges had no power to dispose of— without reference to private claims. It is claimed, however, on behalf of the People, that we are bound to take judicial notice that no valid titles existed here, and that the whole domain was subject to the absolute disposal of the United States, who delegated, intentionally, to the Governor and Judges, complete power over it; and that, in making the

plan, they were but carrying out this power. The jury, certainly, find no such facts. A review of the facts appearing from the public acts of the country will show whether the position taken is correct or not.

Detroit formed originally a part of the French possessions which were ceded to Great Britain by the Treaty of Paris of 1763, in which provision was made for the full protection of private rights and possessions. By the treaty of peace between the United States and Great Britain, made in 1783, it became a part of the possessions of the United States, and was included, by the Ordinances of 1787 and 1789, within the Northwest Territory. But it was, with the other posts in the northwest, retained by the British authorities until 1796, when it was formally delivered up under Jay's Treaty of 1794. By the latter treaty more full and specific protection was granted to the settlers in their rights to land, legal and possessory. By a technical interpretation, our Government might have avoided sustaining any but perfect titles; but the manifest injustice of such a course led to a more generous and humane interpretation. In 1802, an inquiry was set on foot by the United States, and Mr. Jouett, the Indian Agent, reported to the Government upon the subject. His report was not based upon an actual and authorized investigation into each case, upon the documents, but it was the foundation of the subsequent action of Congress. We do not here refer to its facts (although they were surprisingly accurate, considering the circumstances), for they could not be properly regarded in this controversy. In March, 1804 (2 *St. U. S.* 277), an act was passed requiring all persons claiming lands within the districts attached to the Land Offices at Detroit, Vincennes, and Kaskaskias, to exhibit their claims by virtue of any legal grant made by the French Government prior to the Treaty of Paris of 1763, or of any legal grant made by the British Government subsequently to that, and before the Treaty of 1783, or of any act or resolution of Congress after the Treaty of 1783. The Register and Receiver, as commissioners, were

to record the evidence in each case, and to make separate reports—one of affirmed and another of rejected claims—with the evidence, and with any remarks thereon which they might deem proper. In March, 1805 (2 *St. U. S.* 344), the time for exhibiting claims was extended, and all persons were authorized to exhibit to the commissioners any claims, whether based on legal grants, actual possession and improvement, *or for any account whatever.* Similar reports were to be made of confirmed and rejected claims; and in all cases of rejected claims based on possession and improvement, they were particularly required to state the date and extent of the improvement, and the extent of land claimed, with its situation and boundaries. All lands so claimed, whether the claims were confirmed or rejected, were to be reserved from any disposition until the further action of Congress. In June, 1805, Detroit was burned. On the 21st of April, 1806, before Congress had acted on any of these claims, an act was passed, the first section of which is as follows:

"*Be it enacted,* &c., That the Governor and the Judges of the Territory of Michigan shall be, and they, or any three of them, are hereby authorized to lay out a town, including the whole of the old town of Detroit, and ten thousand acres adjacent, excepting such parts as the President of the United States shall direct to be reserved for the use of the Military Department, and shall hear, examine, and finally adjust all claims to lots therein, and give deeds for the same. And to every person, or the legal representative or representatives of every person who, not owning or professing allegiance to any foreign power, and being above the age of seventeen years, did, on the eleventh day of June, one thousand eight hundred and five, when the old town of Detroit was burnt, own or inhabit a house in the same, there shall be granted by the Governor and Judges aforesaid, or any three of them, and where they shall judge most proper, a lot not exceeding the quantity of five thousand square feet."

The second section directed the residue, after satisfying

such claims, to be sold, and the proceeds appropriated to build a court house and jail in Detroit; and the Governor and Judges were to report their doings to Congress.

On March 3d, 1807 (2 *St. U. S.* 437), an act was passed confirming all the claims allowed by the commissioners. The act further provided that all possessory claims, originating previous to July 1st, 1796, should be confirmed by a new board, appointed by the act, as estates in fee simple, if not exceeding six hundred and forty acres; and patents were to issue upon certificates granted by the commissioners. The same act declared "That the powers vested by this act in the commissioners above mentioned *shall not extend to lots in the town of Detroit, the claims to which shall be ascertained and decided upon in the manner provided by the act entitled "An Act to provide for the Adjustment of Titles of Land in the Town of Detroit, and Territory of Michigan, and for other purposes."*

Some subsequent acts were passed, all aiming at securing the claims and equities of settlers, but which are not material to this inquiry.

It was claimed, on behalf of the People, that the only power given to the Governor and Judges was to convey "lots" in such forms and dimensions as they should delineate them upon their plan, and with reference to the details of the plan. But the acts referred to, and the construction put upon them by the Supreme Court of the United States, as well as by this Court, will show that this ground is entirely untenable.

In the case of *Forsyth v. Reynolds,* 15 *How.* 358, Robert Forsyth claimed title to a lot in Peoria, under an act of Congress which confined the right to such lots to settlers who "had not heretofore received a confirmation of claim or donation of any tract of land, or village lot, from the United States." It was shown that he had received confirmations of two claims in this county, above Detroit, under the act of March 3d, 1807, above referred to. The court held that

while that act pointed out the only means whereby he could obtain title, yet the grants under it were not mere gratuities, but were made to carry out, in good faith, the equitable intentions of Jay's Treaty; and that the benefits obtained by the United States from that treaty were the consideration upon which they were assured to the settlers. The court therefore decided that Forsyth was not cut off from the right to a lot in Peoria. This court, in the case of *May v. Specht*, 1 *Mich.* 187, took a similar view of the act of 1807. See also, *May v. Tillman*, 1 *Mich.* 262.

The Governor and Judges had the same authority over every class of claims within the city of Detroit which the commissioners had on outside claims, with the additional right and obligation to decide thereon finally, and execute deeds without waiting for the action of Congress, or the Departments. We have not, nor has any other court, the power to go behind their conveyances, so long as they acted within the jurisdiction vested in them by Congress. It is claimed, however, that the lots they were empowered to adjust and confirm the titles to, were to be such lots only as they should lay out on their plan. We think this is not a correct view of the act.

The act does indeed provide that certain persons should receive lots not exceeding five thousand square feet each; but these lots are mere donations, confined to actual residents, and citizens of the United States, who were burnt out by the fire, and were intended in some measure as an indemnity for their losses and inconveniences. But the *claims* to be adjusted were such as any person, citizen or alien, had a legal title or equitable claim to, under the acts of Congress passed to protect ancient titles and settlements. Upon satisfactory proof, the Governor and Judges had no right whatever to deprive a claimant of any portion of the land actually belonging to him under those acts of Congress, whether it interfered with any projected plan or not. As we have already seen, Jefferson and Woodward Avenues had become legal highways

by statute; and so far the claims might perhaps be interfered with, upon payment of damages, if required; but no power existed, without consent, to curtail the full rights of any one to his ancient possession. It may have been in the power of the board arbitrarily to refuse to confirm just claims, but such an act would have been a gross abuse; and the facts found in this case show that no such tyrannical expedient was resorted to.

Instead, therefore, of assuming that the lands in Detroit were vacant parts of the public domain, entirely subject to the control of the Governor and Judges, we are forced to take notice that rights existed, both individual and public, which they were legally bound to respect. And this fact, in our judgment, is entirely inconsistent with the idea that the adoption of the plan was intended by them to be a final and absolute act which could not be reviewed or explained. The very terms of the resolution adopting it, leave the door open to future modification. And any attempt on their part, by such action, to cut off or diminish the rights of claimants, would have been a clear infraction of duty. It was desirable, undoubtedly, for them to have some plan at once, in order to lay out lots for donations to the sufferers by the fire, and who might not have claims under the general acts of Congress; and so far as claimants could be induced to accept new lots in exchange for their old ones, to adjust the claims in that way; but, until such claims were settled in one way or the other, and until the military reserves were all defined, it would be impossible to tell whether the lines of the plan could be adhered to or not. The northern and eastern lines of this section were established already, but its interior arrangement was liable to modification by interfering claims and reserves. It would be going very far to hold that when circumstances might render it necessary, on these accounts, to accommodate the plan to such contingencies, a board of plenary powers, under an act of Congress, should be hampered by any narrow rule applicable between individuals in

the execution of common law powers, which might destroy the usefulness of their whole action. The act of Congress gives them a very broad discretion; and so long as their subsequent action should not interfere with vested rights of individuals, or of the municipality, we do not perceive how an original act, never intended as a finality, and which, if so intended, would, in great part, conflict with private estates as well as public reserves, can be properly regarded as unchangeable. The powers of the board must be so construed as to harmonize them, and not to make them conflict with each other.

The street in question, as laid down on the map, ran from Jefferson Avenue to the river, crossing Woodbridge street in the way. The plan does not show the supposed water line, not having been made by survey, but being a paper plan merely. In fact, the jury find that the water came nearly or quite up to Woodbridge street. The case shows that all of the dry land embraced in the projected street, was private property. The Dodemead lot occupied the space between Jefferson Avenue and Woodbridge street, while the Beard and Greeley claims appear to have been in that street, and to have reached its southern line, where the grant of 1811 commences. We can not suppose that the board intended or imagined that the platted street was to be then, or at any other time, a highway, until the land should be lawfully taken and paid for. The whole case negatives any such idea. And the land was not theirs to dedicate.

But it appears that the city authorities have not been passive. In 1828, they disregarded the plan by opening a new street of forty-four feet in width, covering to that extent, and no further, the street projected; and did so under their authority to lay out streets through private property on payment of damages. This was a clear waiver of any rights in the premises under the plan, if such existed. This point was decided, under similar circumstances, in the case of *Seaman v. Hicks*, 8 *Paige*, 655.

And it is further to be observed that, by the City Charter of 1827, the corporation was expressly prohibited from opening any street under the plan, without previous notice, and was required when any claim of damage was set up by any person through or adjacent to whose premises such street would pass, to have his damages assessed and tendered, before any further step could be taken.—*Laws of* 1827, p. 578, §§ 18, 19.   This law forbids the idea that any unopened street could be regarded as a highway, whether so intended in the first place or not.

Many other considerations worthy of attention were submitted to us, but as we were informed upon the argument that controversies have arisen concerning portions of the public grounds differently situated, we reserve any other points for examination when they may arise hereafter.

We are clearly of opinion that the defendant, upon the finding of the jury, is not guilty of any infringement of public right, and that judgment should be rendered in her favor upon the verdict.

The other Justices concurred.