JAMES M. SANBORN ET AL. V. SAMUEL W. VANCE.

*Land grants—Survey—Homestead entry.*

This case involves the relative rights of claimants under a homestead
    entry, and under an earlier grant and confirmation from the
    United States and a continuous possession for over half a cen-
    tury, and the opinion contains an interesting review of the his-
    tory of the last-named claim, and as a conclusion finds that the
    homestead entry could not have been made in good faith, and
    directs a release to complainants.

Appeal from St. Clair. (Stevens, J.) Argued January
31, 1888. Decided April 6, 1888.

Bill filed to remove a cloud upon complainants' title, and
compel a release by defendant of his claim under a homestead
entry. Decree below dismissing bill reversed, and one
entered granting relief prayed for. The facts are stated in
the opinion.

*Farrand & Jenks (John H. Bissell, of counsel),* for com-
plainants.

*E. W. Harris,* for defendant.

CAMPBELL, J. Defendant, Vance, claims a wedge of land
containing 10 acres and a fraction, on the St. Clair river,
which was obtained in 1885 by one Coon under color of a
homestead entry from the general land-office, and by him
conveyed to Vance. Complainants claim that this entry and
title are invalid, and that the land had been owned and pos-
sessed by their grantors and themselves for considerably over
half a century, under grant and confirmation from the
United States. They insist that defendant's alleged title is
a fraud on their rights, and inasmuch as he holds by an

apparently legal grant from the United States, which oper-
ates as a cloud on their title, and which he has sought to
enforce by ejectment, they have filed this bill to settle the
controversy and compel a release.

The court below dismissed the bill, assigning no reason for
it on the record.   The claim is made here, and possibly may
have prevailed below, that complainants had a full right to
set up their claims in defense of the suit at law.   But we do
not think that this objection should prevail.   While no doubt
some of the important questions in the controversy might be
tried at law, no complete remedy could be had in a court of
law; and some equitable considerations exist, which render a
court of equity a proper tribunal to dispose of the entire
merits.   The case went to issue on the facts, and testimony
is before us covering them all.   We think there is no lack of
jurisdiction in the matter.

The complainants represent the ownership of private claim
No. 304 of the claims confirmed upon rights existing prior
to 1796 in Michigan Territory, and established under various
acts of Congress, passed to comply with the undertaking of
the United States in Jay's treaty of 1794.   They also own
that part of fractional section 7 in township 4 north, of range
17 east, which bordered on private claim 304, and was made
fractional by the shape of that claim.   Defendant, on the
other hand, claims that the 10 acres of which he has procured
a grant is a part of section 7, which was not originally set out
in its subdivision, and was not discovered to exist, or not to
have been disposed of, until just before Coon entered it.

In order to understand the real controversy it will be
proper to refer to the surroundings of the entry of the private
claim, as appearing in the records of the land commissioners.
Complainants do not seek to go back of the action of the
land-board for evidence of title, as it has been always held
by the Supreme Court of the United States that all of the
titles confirmed must depend on the action of our own gov-

69 MICH.—15.

ernment. But it was held in *Forsyth v. Reynolds*, 15 How. 358, that these confirmations were not donations, but were made in recognition of existing rights; and the action of that Court has been quite consistent in securing to the confirmees of such titles the rights intended to be confirmed, and preserving them from destruction by the slips or carlessness of the land-boards and land-officers, so far as could be done consistently with right and justice. *U. S. v. Percheman*, 7 Pet. 51; *Mitchel v. U. S.*, 9 Id. 711; *Boardman v. Reed*, 6 Id. 328; *Stoddard v. Chambers*, 2 How. 284; *Bissell v. Penrose*, 8 Id. 317; *Lindsey v. Hawes*, 2 Black, 554; *U. S. v. Stone*, 2 Wall. 525; *Hughes v. U. S.*, 4 Id. 232; *O'Brien v. Perry*, 1 Black, 132; *Stark v. Starrs*, 6 Wall. 402; *Ryan v. Carter*, 93 U. S. 78; *Morrow v. Whitney*, 95 Id. 551; *Wirth v. Branson*, 98 Id. 118; *U. S. v. Schurz*, 102 Id. 378; *Bicknell v. Comstock*, 113 Id. 149 (5 Sup. Ct. Rep. 399).

It appears from the proceedings connected with the private claim 304 that it formed a part of what was a much larger tract, claimed by or through Meldrum & Park, a firm of business men well known in the history of the Northwest. The origin of their title is not legally involved in this litigation, but as a matter of history, appearing in the congressional proceedings, it figured in the course of affairs which led to the congressional legislation under which these proceedings were had, and which was embodied in several successive laws, as each statute was found imperfect before all cases of right were covered. The preliminary reports laid before Congress show that Meldrum & Park were successors in the title of Governor Patrick Sinclair, who owned and used the lands in connection with his mills on Pine river till 1782, and from whose grantee Meldrum & Park obtained it in 1784, and continued working it. See 1 American State Papers, "Public Lands," 176, 246. The title laid before the commissioners by John Meldrum, to whom tract 304 was confirmed, was based on grants

from Meldrum & Park, and was bounded on all sides but that on St. Clair river by lands which were within their claim. But for some reason or other not shown in the testimony in this case the lands lying southerly of claim 304 and of the claims lying west of it were treated as unconceded lands by the land-board, and ultimately were surveyed as part of the public domain.

At the time when the private claims were acted on and confirmed in that region, the public surveys had not been made, and the claims were surveyed and marked on the ground independently of the township and section system. All of them bordered on the great streams or their branches, and, as far as possible, outer lines seem to have been so run as to bound a series of claims, either on one or two sides, by the same lines, usually parallel except in river bends. This was done to prevent confusion, and the consequence necessarily was in some cases to extend and in others to narrow the actual bounds of the confirmed tracts. The variances in this were no greater than are very common in the regular government surveys, which are often changed by imperfect instruments or careless observations, but where in all cases the rule is settled that the lines actually run and marked on the ground must prevail over any theoretical or paper platting, and small excesses or diminutions are disregarded. *Hughes v. U. S.*; *Lindsey v. Hawes*, and cases above.

On the thirtieth of August, 1808, the board of commissioners took up claim 304 for consideration. It was set forth in the application, as was usual, not by survey, but by general description, as follows:

"One tract of 20 acres in front by 32 in depth, being about 640 acres, bounded on the north side by Pine river, on the south by the lands of Meldrum & Park, on the east by the river St. Clair, and on the west by the lands of Meldrum & Park." 1 Public Lands, 396.

On the twenty-sixth of October, 1808, the consideration of

the claim was resumed, and, the title having been shown derived from Meldrum & Park, it was confirmed, and ordered surveyed.

This survey was made by Aaron Greeley, the government surveyor appointed to survey all the private claims at that period. The commissioners had certified it under the same description by which it was claimed, and without fixing it at the exact amount of 640 acres, except by estimation. When the original act of March 3, 1807, was passed for confirming lands to occupants claiming under rights existing in July, 1796, it was provided that no one should get more than one tract, not exceeding 640 acres. But the injustice of this was recognized, as violating the intention of the treaty of 1794, and on April 25, 1808, this restriction to a single tract of 640 acres was repealed. 2 Laws U. S. 503. It appears from the action of the commissioners thereafter that they confirmed titles to the full extent of ownership; but as most claims had already been presented in the shape of separate parcels of about 640 acres, they were usually confirmed in that way, although covering in some instances many thousands of acres. There was no legal obstacle to confirming a tract, however large it might be, and a confirmation could not have been rendered void by the fact that in surveying it more than 640 acres was surveyed in one tract, when the power and intent both existed of giving it all to the rightful claimant.

In surveying this parcel Mr. Greeley bounded it on the north and south sides by parallel lines coincident with the north and south lines of the adjoining confirmed claim, No. 306, to the west, and divided it from that claim by a line at right angles The line upon the north side struck the St. Clair river at the mouth of Pine river, and the north-west corner included a number of acres lying on the north side of Pine river. That river was not meandered, and its course was not mentioned in the survey of the claims. The width

of claim 304 on the north side, as surveyed, is a little less than 20 acres, and the depth of the westerly line a little less than 32 acres. But the St. Clair river line was in such a direction that the claim was wider on the south side than on the north side, and, while Mr. Greeley's survey estimated the whole contents at 640 acres, the tract actually contained about ten acres more. As this supposed excess is the pretext for the extraordinary proceedings recently resorted to, it becomes necessary to refer to what is claimed to have been the difficulty.

There is put in this record what purports to be a copy of a certificate of Mr. Greeley, which leaves out in the courses and distances the whole of the north line, but which in that respect corrects itself by giving the proper terminus at a post on the St. Clair river, near the mouth of Pine river, from which all the meander lines were run southwardly along the river St. Clair. The original survey certificate surrendered by the claimant cannot apparently be found. But as there is no such mistake in any of the other recitals and certificates, it is quite evident that Mr. Greeley returned a true survey throughout, as no other means existed of getting at the lines actually referred to. In running the easterly and westerly lines he described them as north 80 deg. west, going west, and south 80 deg. east, running eastwardly. The true lines, as actually run and marked by posts and monuments on the ground, were north 76 deg. west, and south 76 deg. east. This probably arose from variation of the compass. It is of no consequence in the case in fact, as the lines are all identified. The posts at the various line *termini* were all identified by bearing trees or other signs, and no other posts appear to have been set or identified then or since. The last meander line post on the St. Clair river was at the south-east corner of 304, as claimed by complainants, and as followed in the other government surveys.

The record before us contains what purports to be a receipt

by Mr. Greeley of a copy of an unsigned certificate from the treasury department, which, instead of starting at the southeast corner of the claim as surveyed by Mr. Greeley for the commissioners, apparently started at the next post on the meander line above, and thence ran south, 81 deg. 15 min. west, 23 chains 11 links to a post (which does not appear to have existed), and thence north, 80 deg. west, and so on in the reverse order of description along Greeley's lines, until it returned to the place of beginning. It is this changed line which is relied on by defendant here as meant to strike out 10 acres in the south-east corner from the old description, inasmuch as the patent contains the same variation.

So far as this copy is concerned, it bears the same date as the patent, and was made a year and a half after the survey. If genuine,—of which there is no proof,—Mr. Greeley had at that time no function to perform on the subject. It appears conclusively that the survey was never changed or ordered to be changed. It is not improbable that some meddling busybody undertook to figure out the contents of the claim from the surveyor's return alone, with no knowledge of the ground, and to cut down a supposed excess. But the statute required the claim to be surveyed, and made no provision for any such arbitrary theoretical change in a confirmed tract. If there was any departure from the terms of the confirmation it was on the north side of Pine river, and not on the south side of the tract, and any land left out should have been in the north-west, and not the south-east, corner. But, as already stated, there was no legal reason why the tract confirmed should not include more than 640 acres, as the law stood when the confirmation was had.

It is also clear that, if the patent is to govern on courses and distances, there is not a single correct line in it, as the lines vary four degrees on the ground as run. But the law, as before stated, has always required the survey and lines and monuments on the ground to be conclusive, and the paper

description must always yield to the actual survey, and be discarded where it differs in fact.

But the subsequent and uniform action of the land department contradicts the idea that the survey was ever changed.

By the land laws in force when that region was surveyed, the country was divided into townships running east from the meridian to the territorial boundary, and north or south of the base line, established as the starting points for surveying. The confirmed tracts of Meldrum & Park lands running up and including the course of Pine river lay in townships 4 and 5 north, and ranges 16 and 17 east; or, in other words, they were located in four townships. When the township lines were run, it turned out that private claim 304 was so situated as to include the common converging corners of all of those townships, so that if it had not been in the way the land it covered would have embraced parts of sections 1 and 12 in town 4 north, of range 16 east; section 7 in town 4 north, of range 17 east; section 36 in town 5 north, of range 16 east; and section 31 in township 5 north, of range 17 east. In this way, if this claim had stood alone, it would have made five sections fractional. But as, in connection with the other claims, it covered up entirely some government divisions, this particular claim rendered fractional only the sections along its south side, which were sect ons 1 and 12 in township 4 north, of range 16 east, and section 7 in town 4 north, of range 17 east. No attempt has been made to disturb it, except on the easterly part of section 7.

When the regular linear township and sectional surveys were made in 1817 and 1818, it became necessary under the land laws to include in each section as surveyed all the land geographically belonging to it, unless already set apart in some other legal way. The easterly side of section 7 was cut into by St. Clair river, and the east line was therefore a meandered line on that river, and was run from the post set

by Greeley in the south-east corner of claim 304. The north side was only affected by claim 304, and the section had, under the law, to follow the boundaries of that claim, as established by authority of the United States. The proof shows that in connecting the surveys the line as actually run by Greeley was the line recognized and followed by every one connected with the business, both on the survey and in the land-office in Washington. All of the lines run or measured on section 7 were started or ended at that line, which was adopted as the north side of the fractional section. The post on St. Clair river, at the end of that line, was accepted as the land-mark of the section boundary, and the meander lines running along the river on the east side of the section began at that post. The official platting of the land in the general land-office adopted it, and the section was subdivided, and put on the market so defined. The maps furnished by the general land-office to the State of Michigan were all projected on the same lines. Section 7, as subdivided, was sold, and all of the east part of the north fraction was sold and patented to complainants' grantor, Daniel Stewart, in 1825. In 1880 James McGregor had become grantee of the southerly part of claim 304, and of the northerly part of section 7, which had long been occupied together under one owner as one parcel or farm. The possession is shown to have been continuous, according to the government map lines, since the title passed in 1812 and 1825 from the government, in successive owners.

In 1883 one Paldi who was engaged in surveying some private lands on another part of the private claims, seems to have stumbled on the local records indicating that the papers contained defective descriptions, and although the court below —erroneously, as we think—refused to allow him to be pressed on cross-examination as to his conduct in the matter, the result was that without notice to any of the parties in possession, and without any new survey, the general land-

office was by some one and in some way induced to what the commissioners saw fit to call "construct" a diagram of what he also called "lot 2 on section 7," which Coon was allowed to enter as a homestead entry of ten acres and sixty-two hundredths of an acre, "*according to the official plat of the survey of the said land returned to the general land-office by the surveyor general.*" As the land was actually adversely occupied under the old grants, it is difficult to see how a true showing could have been made under the homestead law. But this land, whatever it. may be called, was, according to all the government surveys, and according to the official plats, the south-easterly portion of private claim 304, as confirmed and as identified. Furthermore, if not actually a part of that claim, it must have been in the east part of the north fraction of section 7, which, by all the maps and surveys, joined the private claim, and covered all the land not in that. It is impossible under the land laws to get this new parcel outside of one or the other of those old parcels. But we have no doubt it legally belonged to the private claim, as confirmed, and as actually surveyed, and we have as little doubt that, even if that claim should have been confined to 640 acres, there was less than that quantity of acres south of Pine river in that tract.

This map "constructed" in the land-office in 1884 is nothing but a paper subdivision; and, had any actual survey been attempted, no doubt the parties in interest would have found means to protect their rights from this underhanded and fraudulent invasion.

The case presents an aggravated instance of a class of wrongs which cannot be adequately remedied by ordinary civil redress. A possession which has probably lasted considerably more than a century, and which is shown conclusively to have dated back within 10 years of a century, was entitled under the acts of Congress to be confirmed in its full extent, and was so confirmed in fact, and officially surveyed. Such

a confirmation could not lawfully be disturbed by any land-office blunders or intermeddling, and, as a matter of fact, was fully covered by all the regular surveys and plats under which that whole region has been conveyed by the government as early as 1825, and much of it many years earlier. The actual boundaries were all known and acquiesced in, and it is impossible that the entry by defendant's grantor could have been made in good faith. The testimony is not open to any doubt on that point.

The location of the Meldrum grant is not a difficult question, and is one purely of fact. We have no doubt it covered the land in dispute.

The decree below must be reversed, and a decree made requiring defendant to release the land to complainants, and enjoining him perpetually from setting up any further claim to it. Costs of both courts will be decreed to complainants.

The other Justices concurred.