## Edward V. Cicotte v. Theophile Anciaux et al.

*Judicial notice—Ancient titles in Detroit—Religious corporation—Sale of church property—Injunction against co-trustees—Party.*

1. The Supreme Court of Michigan has no judicial knowledge of the contents of Detroit plats or of the location of Detroit lands, except as identified or affected by legislation or other public action.

2. No presumption can be indulged against the lawful character of the conveyances of the "Governor and Judges" of Michigan Territory.

3. The "Governor and Judges" of Michigan Territory had power to change the plan of the City of Detroit so long as they did not interfere with established rights.

4. The plan on which Detroit was originally laid out left many triangular parcels of land which the "Governor and Judges" set aside for public purposes to be thereafter declared by the city council. In 1834 the Governor and Judges granted unreservedly to Ste. Anne's church the use of a particular triangle for religious purposes. In 1837 the city, acting under a power conferred by its charter, exchanged certain lands with the church, and in doing so gave it the triangle. *Held*, that whether the city had any title to the triangle at that time or not, it is estopped from denying its conveyance, because in 1842 it was given full legal title to the lands covered by the old plan ; and after the lapse of forty years during which the city made no adverse claim, a quit-claim of the property by the church should be sustained.

5. A sale made by a corporation by quit-claim leaves no liability on the corporation in case the title is less than is supposed, and raises no question under the doctrine of ultra vires.

6. After a trustee of a religious corporation has concurred in obtaining a license to sell its property he can hardly object to a sale on the ground that the corporation has no right to sell.

7. Courts of equity cannot interfere with the action of such officers as a corporation has placed in charge of its affairs unless it exceeds their discretion or amounts to aggravated misconduct equivalent to actual or constructive fraud.

8. A trustee cannot get an injunction against his co-trustees on an unsworn bill ; and there can be no equity in his favor if he does not do what he can to restrain them speedily.

9. In a suit to rescind the deed of a corporation the corporation itself should be complainant or should at least be a party to the record ; otherwise, when the only prayer is for a cancellation of the bargain, it is fatally defective, since that concerns the party injured only and cannot be granted without a re-payment of the money and release of securities, and the giving of proper allowances for what the purchaser may have ventured in reliance on his title.

Appeal from Wayne. (Speed, J.) Jan. 16.—April 9.

BILL for rescission. Complainant appeals. Affirmed.

*Charles F. Burton* and *Alfred Russell* for complainant. A member of a corporation, though not a trustee, can maintain a bill to set aside the action of its officers if it amounts to a breach of duty : *Dodge v. Woolsey* 18 How. 341 ; *Mott v. Penn. R. R. Co.* 30 Penn. St. 1 ; *Brewer v. Boston Theatre* 104 Mass. 378 ; *Wood v. Draper* 24 Barb. 187 ; *Peabody v. Flint* 6 Allen 52 ; *Cross v. Sackett* 2 Bosw. 617 ; *Mann v.*

*Butler* 2 Barb. Ch. 362; Story Eq. Pl. § 107, 119–135: *Dennis v. Kennedy* 19 Barb. 517; *Forbes v. Memphis* 2 Woods 323; *Walker v. Devereaux* 4 Paige 229; *Gray v. Chaplin* 2 Sim. & S. 269; *Bagshaw v. Eastern Ry. Co.* 2 Mac N. & G. 389; *Mussina v. Goldwaite* 34 Tex. 125; a single stockholder may do this, though opposed by every other stockholder: *Burt v. British &c.* 4 De G. & J. 158; *White v. Carmarthen R. R. Co.* 8 Hem. & Miller 786; *Lyde v. Eastern Ry. Co.* 36 Beav. 10; a sale of a nature not allowed by the law of the corporation is ultra vires not only of the trustees, but of the whole body of the corporation, and the assent of every member would not validate it; *Ashbury R. C. v. Riche* L. R. 7 H. of L. 653.

*James Caplis, Geo. H. Hopkins* and *F. A Baker,* for defendants, cited *F. & M. Bank v. Detroit* 12 Mich. 445 to the point that the title to the property in suit, that was conveyed to the City of Detroit by Congress in 1842, inured to the corporation of Ste. Anne's Church; a majority of a quorum have authority to decide any question upon which they may act: *Sargent v. Webster* 13 Met. 497; the corporation itself is a necessary party defendant to a bill to set aside a deed given by its trustees: Green's Brice's Ultra Vires, 571: *Davenport v. Dows* 18 Wall. 626; complainant should allege that he applied to the board of trustees to file a bill in the name of the corporation: *Dodge v. Woolsey* 18 How. 331: and the bill cannot be maintained unless there is a clear default on their part involving a breach of duty: *Memphis v. Dean* 8 Wall. 64, 73.

CAMPBELL, J.   Complainant, who in his bill claims to be a trustee and parishioner of Ste. Anne's church, Detroit, files the bill in this cause to obtain the rescission of a deed made in the name of the corporation of that church to James Caplis, who conveyed to John J. Bagley, now deceased, of a parcel of land heretofore claimed and occupied by the corporation, between Larned and Congress streets, in the city of Detroit, extending from Randolph street westward 250 feet.   The grounds relied on are that the land was not subject to sale; that it was not sold by the action of a sufficient number of trustees; and that the terms of sale were not as good as might have been obtained.   The parties defendant are the curate or rector and George W. Van Dyke, An-

toine Morass and Gregory Campau, claiming to be trustees, and James Caplis and the heirs of Gov. Bagley, as purchasers. Caplis demurred and the bill was dismissed.

The bill which was filed August 17, 1882, is not sworn to, and contains no full statement or exhibit of most of the important documents on which the claim to relief is based. Its imperfections of this kind are so serious that it is difficult to discuss several of the questions which were somewhat touched on during the argument, and we shall only refer to such matters as seem to be essential.

The corporation known as the Catholic, Apostolic and Roman Church of Ste. Anne, of Detroit, is alleged to have filed the proper articles to complete its corporate rights under "An act concerning religious societies," passed April 3d, 1807. 1 Terr. L. 209. Section 2 of that Act, recognizing the existence of the church, and its ownership of property, provided for its adopting such regulations as it should see fit for the management of its estates and temporalities, and choosing such persons as it should think proper, who should assume the style and title designated, and that the articles should be properly certified and recorded, and that the body corporate should become seized of all the present property, temporalities and estate of the church. A previous section had provided that trustees might take and alien any kind of property except slaves. In accordance with this Act, the church, by a proper article, provided that the affairs should be managed, as they state had already been done from time immemorial, by the curate, (as the bill renders the phrase from the original,) and four curators or trustees chosen by the "ancient trustees," and that three trustees, or the curate and two trustees, should be a quorum to transact business. Enough appears to show what is historically familiar, that this is an ancient French parish organized according to the methods of the Gallican church, with elected lay trustees as managers of its temporalities. The treaty of Paris in 1763 recognized all these old organizations as entitled to protection, and the Act of 1807 was plainly designed to enable the parish to obtain record evidence of its corporate constitution

under the American local government.   The parish has been since affirmatively recognized by Congress, by the treaty-making power, and by the State as well as territorial legislature, as owning land in Detroit and elsewhere.   See 7 U. S. Stat. at L., p. 166; 6 id. 315, (where reference is made to the deed from the Governor and Judges set forth in the bill;) 3 Terr. L. 977; Sess. L. 1841, p. 136.   By section 2 of the schedule of the present Constitution it was provided that all rights of bodies corporate should continue.

The bill states that on the 11th day of January, 1817, the Governor and Judges conveyed to the corporation, among other lands, sixteen lots specified in section one, with a proviso that on four of them no building should be put up to prevent access through Randolph street to the rear of the city until 1831, unless another communication should be opened.   Permission was also given to use the interior triangle in said section for building a church thereon, provided it should be built within a time specified, but not granting a fee.   The next year the Governor and Judges made a further grant of the use of this triangle and adjoining open space so long as the church should be used for public worship.   In 1834 the Governor and Judges made a deed granting to this corporation and its successors, forever, the use of the interior and central triangle of section 1, "to the end that they may from time to time, as they shall deem necessary, erect thereon any buildings or improvements suitable for ecclesiastical, literary or benevolent purposes."   This being a grant of an estate in fee-simple, with no conditions or reservations and no clauses of forfeiture, appears, so far as the bill shows, to have vested all the title that the Governor and Judges could grant, in the corporation.

And it is proper here to say that the bill contains no averments whatever which show directly where or how great this interior triangle is, or whether the land now in controversy is a part of it.   Neither does the bill show the consideration of any of these deeds, and whether they were given as gratuities, purchases, or in exchange for the other property rights of the corporation in the old town, concerning

which the Governor and Judges had plenary power of settlement. The Act of Congress of 1824 refers to this deed of January 11, 1817, as conveying land in another part of the city which was within the old picket lines, where presumptively the old possessions would be preserved in their substance. This Court has no judicial knowledge of the contents of plats or of the location of Detroit lands, except as identified or affected by legislative or other public action, and there can be no presumption against the lawful character of the conveyances of the Governor and Judges. It was held in *People v. Jones* 6 Mich. 176, that there was nothing in the action of the Governor and Judges in platting various parts of the city to prevent them from changing the plan, as they frequently did in places, or dealing with parcels of property, unless in violation of some established and vested rights which were beyond their reach. It appears affirmatively that no action was ever had during the existence of the territory to fix any public easement in any portion of this grant which would prevent them from disposing of it, as they did dispose of it, for the use of this corporation. And in *Hinchman v. Detroit* 9 Mich. 103, the power of the city of Detroit, conferred by its charter, to vacate public grounds was held applicable to one of the public squares laid out by the Governor and Judges, and not exempted as some other of those grounds have been from city interference. And in *Cooper v. Detroit* 42 Mich. 584, where the city vacated part of a street in this same vicinity and used it for proprietary purposes, it was held such use was an adverse possession against any public rights and protected by lapse of time against resumption.

Assuming (what, as already shown, does not appear in any distinct way in the bill) that the interior triangle covers part of the land in controversy in this suit, it further appears that in 1837 the city of Detroit desired to change this part of the plan of the section by running Congress street and Randolph street so as to make a quadrangular block, which required the appropriation of a large part of the lots desig-

nated in the grant as conveyed, which would convert into public streets an amount of their undisputed private property equivalent to a large part, if not to all, of the space of the interior triangle, and leaving a considerable number of fractional lots which, as separate parcels, would be made inconvenient and of reduced value. To make this improvement the city exchanged conveyances, taking deeds from the church of the land in the new streets, and conveying to the church unconditionally the interior triangle. It is claimed, however, that at this time the city had no title to convey.

But by the act of the Governor and Judges designating these interior spaces for public uses, it was declared that it should be for such purposes of utility or ornament as the city council of Detroit should at any time provide. 1 Terr. Laws, 288. Whatever power the Governor and Judges may have had on the subject, the public uses, except as otherwise designated, were city uses, and for the city's benefit or convenience. By the charter of 1824 the city was given very general power in regard to opening and changing streets, and in 1827 it was expressly authorized to alter that part of the plan of the city lying north of Larned street, both east and west of Woodward avenue, so as to make the streets run parallel to, or at right angles with, Woodward avenue, (which crosses Larned street at right angles,) and to exchange lots with the owners of property affected so as to give them an equivalent. 2 Terr. Laws 344. This is the authority under which Congress and Randolph streets were laid out over the church property, and it was under this that the deeds were exchanged. The city clearly meant to bind itself, and did so for an equivalent; and would be estopped from disputing it. In 1842 Congress gave to the city the full legal title to all the lands which had been covered by the old system, with some exceptions which indicate that the government intended to give the city entire title and control of all that lay within the plan, and also gave it the same power which had during the territory belonged to the Governor and Judges. 5 U. S. Laws, 541. Whatever title was then not vested in the church became vested in the city, which does not appear to have attempted to repudi-

ate its conveyance of 1834, or to have claimed any adverse rights. After a lapse of nearly forty years we do not think that the case requires any attention to be paid to this supposed shadowy possibility in determining the controversy before us. It is not, so far as we are now informed, a question involving the doctrine of ultra vires. The corporation of the church claims a title, and may sell it. As it has here been sold by quit-claim, the sale involves no corporate liability in case the title is less complete than, for anything we can perceive, it seems to be, and there can be no complaint of such a risk.

If then, the corporation had an interest which could be sold, it puts the case, so far as this complainant is concerned, on a footing which would cut him off from some of the complaints which he makes, even if well founded. But there is another feature of this matter of title which cannot be overlooked. The bill shows that in 1876 the corporation of which complainant was then a trustee, supposing it either necessary or desirable to obtain a license from the circuit court to sell the land, proceeded and obtained such license. The bill, in an indirect way, seems to suggest there was some irregularity in it, but nothing is so alleged as to show it, and as complainant must be assumed, from what appears in the bill, to have approved this action, it hardly lies in his mouth now to object to this sale on any ground that attacks the right of the corporation to sell; whether under its plain corporate powers under the Act of 1807, or under the license, if it was thought best to seek that for any supposed reason of policy.

This narrows the case to the inquiry whether complainant has shown any such misconduct as the court of equity can deal with, and whether the complainant has put himself in a position to seek interference.

The bill is claimed to have been filed under the chapter of the Compiled Laws relating to the jurisdiction of equity over corporations, as amended in 1879, so as to allow single trustees to intervene. Comp. L. § 6564; Pub. Acts 1879, p. 194; [How. Stat. § 8152]. It is sufficient to say that the same chapter excludes any proceedings under it in the case of religious.incorporations as well as some others involving no

commercial. purpose. § 6585 [§ 8173]. It was chiefly, if not solely, designed to protect business corporations having stockholders with pecuniary interests involved in its management.

In the absence of a statute it is well settled, and has always been recognized law, that courts of equity can never interfere with the action of such officers as have been placed by the corporation itself in the control of its affairs, unless either in excess of their discretion or in aggravated cases of misconduct amounting to actual or constructive fraud. In our opinion this bill does not make out such a case. The inferences which we are asked to draw are that the sale was made really by Mr. Anciaux, the rector, and that the trustees who acted with him did so under his clerical influence, and also that the action was surreptitious and not had at a meeting where all could be heard. It is also claimed that Gregory Campau is not a lawful trustee, because he resides out of the parish. There is also a general allegation of conspiracy, which is as vague in itself as the general combination clause, and amounts to nothing, except so far as it may be supported by the other charges of supposed illegality.

So far as Gregory Campau is concerned, he is not only an officer de facto, who has not been replaced, but the ground of his alleged incapacity does not appear to have support either in sufficient allegations of fact or grounds of law. It is evident from the Act of 1807 that this church was supposed to have an existence involving no necessary territorial limits of parochial membership, and it must at least be assumed that when the ancient trustees, constituting the electing body, choose a trustee, they determine that he is in fact eligible. We do not think his official authority can be questioned in this indirect way.

It is certain that Mr. Anciaux has no more authority than any one else, and that no trustee could properly govern his own action by anything but his own uninfluenced sense of duty. But by the charter the action of the rector and two trustees is put on as good a footing as the action of three trustees, and binds the corporation where that would bind it,

and the bill contains no such averments of fact as make out any case of ecclesiastical duress.

The bill is not fairly drawn so as to present any distinct allegation of irregularity, and none can legitimately be inferred from it. Attention has already been called to its almost uniform failure to state the real facts from which alone a court has a right to deduce misconduct. Complainant, being a trustee, had legal right of access to the books and legal means to enforce it if denied him. He does not deny either access or knowledge. What he says is that he has never been advised of any meeting of the trustees called for the purpose of considering the contract, or at which the contract was considered when all of said trustees or a majority of them were present, and that he himself was not present when said contract was in any way considered. If he had stated what actually occurred, and under what circumstances the contract was adopted, as he could and should have done, its authenticity would have been placed within easier reach of determination. But all that is averred is perfectly consistent with a regular meeting when a quorum was present, and when the contract was approved by the rector and two trustees, and taking all that the bill sets out elsewhere, it indicates pretty clearly that such was the fact. It is enough now that it does not appear that such was not the fact.

There is a further feature of this case which is very significant in its bearing on the propriety of equitable interference. It appears that complainant himself was not opposed to a sale in general so much as he was opposed to this sale, and that he was early informed of the pendency of the dealings with Caplis, and gave notice of two other offers,—one of Capt. Pridgeon, for the same parcel, sold at the same price of $100,000 in cash, while the Caplis sale was partially on time; and one of Mr. Sheley, of $200,000, for the south half of the entire quadrangle, which the bill states was a smaller portion than that sold to Caplis. We cannot say whether Sheley's offer was or was not better than the others, for it is quite possible that the whole Larned-street front may be the chief value of the

tract; and it is also possible that such a sale would interfere with the continuance of the church occupation. Neither can we say that a sale for cash is necessarily better than a sale on credit, secured, on good terms of interest, if the corporation has no immediate occasion to expend the money. Neither is there any principle which should invalidate a sale to a purchaser because brokerage was paid to one agent while another person was willing to act without. All of these things might or might not bear on fraud, if fraud was made out by any distinct allegations. But the rule is a just and safe one, that fraud must be consistently and promptly acted on. Here, if complainant really believed his colleagues were violating their duty and defrauding the church, he was bound at once to stay them in their attempt before it was consummated, if possible, and at any rate to intervene so as to prevent any danger of loss to the purchaser. Here he suffered the contract to be completed, and the deed to be given, and the whole arrangements on both sides to be completed, in March, 1880. He did not file his bill until August 17, 1882, when Gov. Bagley had bought of Caplis, and had died, leaving his estate in the hands of his executors and devisees. The bill filed at that late date was not sworn to, so that no injunction was asked or attainable until the final hearing, when complainant himself might have ceased to be a trustee, and no attempt was made to stay future mischief. Whether this is a bill which would be demurrable for want of an oath, is not very material. It is certain that a trustee cannot get out an immediate injunction against his co-trustees on an unsworn bill, and that there can be no equity in his favor unless he does what he can to restrain them speedily. The delay in this case is in no way excused or explained.

We have referred to the merits, because, after this lapse of time, there could be no propriety in treating these defects as mere slips and open to amendment. A further and incurable defect is that the only prayer of the bill is for a cancellation of the bargain, which not only concerns the corporation as the only party injured, but could not be granted without a repayment of money and release of securities, as well as proper

allowances for what may have been done by the purchasers in reliance on their title. The corporation should have been a party complainant or a party to the record, at any rate, and neither of these conditions has been shown. As the case stands it has no foundation on any theory.

The decree must be affirmed with costs.

The other Justices concurred.